[L.A. No. 29873. In Bank. Sept. 19, 1972.]

GORDON M. CURTIS, JR., et al., Petitioners, v.
BOARD OF SUPERVISORS OF LOS ANGELES COUNTY et al.,
Respondents.

**COUNSEL**

Richards, Watson & Dreyfuss and James K. Herbert for Petitioners.

John D. Maharg, County Counsel, David D. Mix and Edward H. Gaylord, Assistant County Counsel, Joe B. Hudgens and Douglas V. Hart, Deputy County Counsel, O'Melveny & Myers, Bennett W. Priest, Richard P. Volpert, Thomas H. Childers, Lowell C. Martindale, Patrick Lynch and James V. Selna for Respondents.

## OPINION

**TOBRINER, J.**—When persons owning a majority of assessed valuation of land within the proposed City of Rancho Palos Verdes filed a written protest, the Los Angeles County Board of Supervisors, pursuant to Government Code section 34311, refused to call an incorporation election. The crux of petitioners' plea to us is that section 34311 violates the Constitution; upon this basis they seek mandate to compel the board to resume incorporation proceedings. ■ We have concluded that the section is, indeed, unconstitutional under the equal protection clause of the Fourteenth Amendment to the United States Constitution and the correlative provisions of the California Constitution. (Cal. Const., art. I, § § 11, 21; see *Serrano v. Priest* (1971) 5 Cal.3d 584, 596, fn. 11 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Section 34311 grants owners of large tracts of land the power to veto the formation of a new city, to the disadvantage of both residents who own no land and those whose holdings consist of small improved parcels; this classification does not rest upon a compelling state interest and is not necessary to further any such interest.

In the opening paragraph of their study of California's municipal incorporation laws, Professor Hagman and Instructor Disco say "In California and in many other states of the nation, provisions for municipal incorporation and for changes in the boundaries of local jurisdictions are archaic abominations dominated by the 'horse and buggy' concepts of our rural past. . . . Legislation in many states still reflects outdated patterns where the property tax was virtually the sole source of local government revenue and outdated beliefs that the people in an area, however small, should have virtually absolute control over their 'turf' as demarcated by city and other local government boundaries." (Hagman and Disco, *One-Man One-Vote as a Constitutional Imperative for Needed Reform of Incorporation and Boundary Change Laws* (1971) 2 Urban Law. 459.)

These observations serve as a fitting background for the analysis of this case.

### 1. *California procedures for incorporation of a city.*

Before stating the facts of this case we summarize the procedural steps involved in the incorporation of a city. Proceedings begin when the proponents of the new city file an application with the county executive officer. (Gov. Code, § 54791.)[1] This officer sets and gives notice of a hearing before

---

[1] Hereafter, unless otherwise indicated, section references are to the Government Code.

the local agency formation commission of the county (§ 54793), which is a five-man board empowered to approve, amend, condition, or disapprove proposals for incorporation of cities, and for formation of other local agencies. (§ 54790.)[2] Section 54796[3] sets forth the factors to be considered by the commission; they include the population, the land, the area, the topography, the need for organized community services, the present cost and adequacy of government services, and the effect of the incorporation upon neighboring communities. No petition for incorporation may be circulated or filed with the board of supervisors without the approval of the local agency formation commission.

Once such approval has been attained, the proponents may file with the board of supervisors a notice of intention to circulate the incorporation petition; this notice must be signed by 25 to 50 owners of real property within the proposed city. (§ 34302.5.) Within 120 days after filing of the

[2]Before the organization of the local agency formation commissions under statutes effective in 1963 and 1965, no public body had authority to prevent an incorporation or annexation which was not in the public interest, although as a practical matter the board of supervisors could so alter the boundaries of a proposed city as to render incorporation unfeasible (see *Peart* v. *Board of Supervisors* (1956) 145 Cal.App.2d 8 [301 P.2d 874]). The Knox-Nisbet Act (§ 54773 et seq.) in creating the local agency formation commissions, established standards (§ 54796) which reflect the public interest in "the orderly formation and development of local governmental agencies based upon local conditions and circumstances." (§ 54774.) The proponents of this legislation believed that discretionary action by the local agency formation commissions would eventually supplant the complex and often arbitrary statutory procedures for incorporation and annexation. (See Scott, Keller, & Bollens, *Local Governmental Boundaries and Areas: New Problems for California,* in Metropolitan California (1961) pp. 121-127.)

[3]Section 54796 reads as follows: "Factors to be considered in the review of a proposal shall include but not be limited to:

"(a) Population, population density; land area and land use; per capita assessed valuation; topography, natural boundaries, and drainage basins; proximity to other populated areas; the likelihood of significant growth in the area and in adjacent incorporated and unincorporated areas, during the next 10 years.

"(b) Need for organized community services; the present cost and adequacy of governmental services and controls in the area; probable future needs for such services and controls; probable effect of the proposed incorporation, formation, annexation, or exclusion and of alternative courses of action on the cost and adequacy of services and controls in the area and adjacent areas.

"(c) The effect of the proposed action and of alternative actions, on adjacent areas, on mutual social and economic interests and on the local governmental structure of the county.

"(d) The definiteness and certainty of the boundaries of the territory, the nonconformance of proposed boundaries with lines of assessment or ownership, the creation of islands or corridors of unincorporated territory, and other similar matters affecting the proposed boundaries.

"(e) Conformity with appropriate city or county general and specific plans."

notice, the proponents must file their petition for incorporation, signed by at least 25 percent of the landowners in the proposed boundaries, representing at least 25 percent of the assessed value of land within those boundaries. (§ 34303.)[4]

Upon the verification of the signatures on the petition, the board of supervisors publishes a notice of hearing. (§ 34310.) Section 34311 then requires the board to hold hearings, and provides that "[i]f upon the final hearing the board of supervisors finds and determines that written protests to the proposed incorporation have been filed with the board, signed by qualified signers representing 51 percent of the total assessed valuation of the land within the boundaries of the proposed incorporation, the jurisdiction of the board of supervisors shall cease; no election shall be called and no further petition for the incorporation of any of the same territory shall be initiated for one year after the date of such determination."[5]

If the filed protests are insufficient to divest the board of jurisdiction,

---

[4]Section 34303 reads in part "Proceedings are initiated by filing with the board of supervisors at a regular meeting a petition signed by at least 25 percent of the qualified signers, representing at least 25 percent of the assessed value of the land included in the proposed city limits, . . ." "Qualified signer" is defined by section 34301 as the "owner of an interest in fee" or the purchaser of land under a written agreement to buy. "Assessed value of the land" for purposes of section 34303 does not include the value of improvements. (*Krouser* v. *County of San Bernardino* (1947) 29 Cal.2d 766, 772 [178 P.2d 441].)

[5]Section 34311 in its entirety reads as follows: "The board shall hold a hearing at the time fixed, and may adjourn the hearing from time to time, for periods not to exceed two months in all. If at the time set for the first hearing, there are insufficient written protests filed with the board to terminate further proceedings, the meeting shall be recessed not less than 14 days, and supplemental protests may be filed within 10 days after the first hearing.

"If upon the final hearing the board of supervisors finds and determines that written protests to the proposed incorporation have been filed with the board, signed by qualified signers representing 51 percent of the total assessed valuation of the land within the boundaries of the proposed incorporation, the jurisdiction of the board of supervisors shall cease; no election shall be called and no further petition for the incorporation of any of the same territory shall be initiated for one year after the date of such determination.

"For the purposes of this section written requests for exclusion shall be deemed to be protests.

"Except to the extent that proof to the contrary has been submitted to it, the board of supervisors, in ascertaining whether protests have been signed by qualified signers may assume that the assessees on the last equalized assessment roll of the county are the qualified signers as herein defined.

"Proof of qualifications as a signer shall be in writing, filed with the protest, and, except for copies of instruments of title, shall be verified. Where there is more than one qualified signer with respect to a parcel, the signature of any one qualified signer shall be sufficient to include the entire assessed value of the parcel."

it decides upon the boundaries (§ 34315) and name (§ 34314.5) of the proposed city, and gives notice of an election to determine whether it should be incorporated (§ 34318). All registered voters who have resided within the designated boundaries for the specified period are eligible to vote (see § 34324). The board of supervisors canvasses the vote (§ 34325), and if a majority favors incorporation, the board declares the city incorporated (§ 34326), and files a certified copy of its order with the Secretary of State (§ 34327).[6]

### 2. *The history of the present litigation.*

This case presents no disputed issues of fact. The Palos Verdes peninsula borders the Pacific Ocean in the southwest corner of Los Angeles County. The peninsula contains three small cities—Palos Verdes Estates, Rolling Hills, and Rolling Hills Estates—but most of the area is unincorporated. Petitioners in the present action reside in the unincorporated area. Petitioners Curtis, Derbes, Hackworthy and Ruth own homes in this area; petitioners Federici and Narevsky own no land. All petitioners are registered voters.

The petitioners proposed that the unincorporated land of the peninsula be incorporated into a fourth city, tentatively named Rancho Palos Verdes. The proposed city would have an area of 12.688 square miles and a population of 38,885 by the 1970 census.[7] This area is primarily developed with single-family housing; it also includes large amounts of undeveloped land and commercial holdings of Standard Oil Co. of California and Marineland of the Pacific, Inc. In 1970 the area counted 16,763 registered voters;[8] most of these voters own real property within the city boundaries, but

---

[6]Some California statutes on annexation of territory to a city, or exclusion of territory from a city, also include provisions for a landowner protest. The statutes exhibit, however, a curious lack of uniformity in measuring that protest. When a city annexes inhabited territory under the Annexation Act of 1913 (§ 35100 et seq.), the protest is based on the value of land alone (§ 35121). If it annexes uninhabited property, the protest is based on the value of land and improvements (§ 35313). If it annexes territory of another city, or territory completely surrounded by the annexing city, then, whether or not the territory is inhabited, the protest is based upon the value of land and improvements (§§ 35275, 35414). If a city excludes inhabited territory previously within its borders, the statutes provide no means for landowner protest; an exclusion of uninhabited territory can be defeated by the protest of owners of more than one-half of the land (the statute does not specify whether the protest is measured by area or value) or by any owner of a single tract of land exceeding five acres. (§ 35555.)

[7]Local Agency Formation Commission of Los Angeles County, survey of April 22, 1970, prepared for the Los Angeles County Board of Supervisors, page 3.

[8]*Id.*

over 1,000 do not.[9] The assessed value of land within the city, as of the fiscal year 1970-1971, was $66,836,080. The largest landowner is Great Lakes Properties, Inc., which owns unimproved land valued at $5,802,840, followed by Marineland of the Pacific, Inc. with land valued at $1,337,500. Improvements within the city command an assessed value of $67,827,920, but the record does not indicate the value of specific improvements.[10]

Petitioners filed an application for incorporation of Rancho Palos Verdes on February 8, 1970. After hearing, the local agency formation commission approved the application on April 22, 1970. On May 5 petitioners filed a notice of intention to circulate a petition and on June 25 submitted petitions bearing signatures of about 63.6 percent of the landowners within the proposed boundaries, representing about 42.8 percent of the assessed valuation of land. The board of supervisors verified the signatures and scheduled a hearing for September 8. At this hearing, however, opponents of incorporation filed written protests representing over 55 percent of the assessed value of land. Determining that it had no jurisdiction to proceed further, the board declined to establish boundaries for the proposed city or to call an incorporation election.

Although petitioners commenced this action in the appellate courts without first addressing the superior court for relief, this is a case in which "the issues presented are of great public importance and must be resolved promptly" and thus the action permits the exercise of original jurisdiction by the appellate courts. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].) The case presents issues directly affecting the 35,000 residents of the proposed city and nonresident landowners; pending the resolution of those issues several other proposals for incorporation or annexation of territory within the proposed boundaries must wait in uncertainty. The issues, moreover, extend their import beyond the Palos Verdes peninsula and affect the procedures used for the formation of cities and other local agencies throughout the state.

---

[9]Affidavit of Alice Hackworthy, filed in support of plaintiffs' motion for summary judgment in *Curtis* v. *Board of Supervisors*, United States District Court for the Central District of California, Civil Action File No. 70-2004-FW. All exhibits filed in that proceeding have been submitted to this court for consideration in the instant action.

[10]Figures on assessed valuation are drawn from the affidavit of Phillip E. Watson, County Assessor of Los Angeles County, filed in the federal district court action, except for the figure as to Great Lakes Properties, Inc., which comes from exhibit B to the 1971 application for incorporation of the City of Rancho Palos Verdes.

3. *The standard of equal protection: in order to comply with the require-ment of the equal protection of the laws the classification of section 34311 must rest upon a compelling state interest and must be necessary to further any such interest.*

We set forth, first, the legal principles of equal protection of the laws that control the instant situation. ■ Municipal corporations are polit-ical subdivisions of the state. Subject only to its own laws and constitution, the state may create, expand, diminish, or abolish such subdivisions, and "all this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest." (*Hunter* v. *Pitts-burgh* (1907) 207 U.S. 161, 179 [52 L.Ed. 151, 159, 28 S.Ct. 40]; see *San Francisco* v. *Canavan* (1872) 42 Cal. 541, 557-558.) Yet this exten-sive reach of the state to determine whether and how to create, or alter, municipal corporations does not compose an unlimited power (see *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339, 342-345 [5 L.Ed.2d 110, 113-116, 81 S.Ct. 125]) since in any instance of state action the Fourteenth Amend-ment requires that the state afford the equal protection of the laws to all persons.[11] ■ Section 34311, and the acts of the respondents pursuant to the mandate of that section, unquestionably constitute state action, and therefore are subject to the precepts of the equal protection clause of the Fourteenth Amendment. In any event, the California Constitution also contains equal protection provisions (art. I, § § 11, 21), to which all state statutes must conform.

■ In determining the validity of legislative distinctions, this court and the United States Supreme Court apply a two-level test. (See, e.g., *Weber* v. *Aetna Casualty & Surety Co.* (1972) 406 U.S. 164 [31 L.Ed.2d 768, 92 S.Ct. 1400].) In the typical equal protection case the classification need only bear a rational relationship to a conceivable legitimate state

---

[11]Respondents cite cases which hold that municipal annexation is a political question, and that state annexation procedures are not subject to any federal con-stitutional limitations. (*Deane Hill Country Club, Inc.* v. *City of Knoxville* (6th Cir. 1967) 379 F.2d 321, 324-325; *Detroit Edison Co.* v. *East China Township School Dist. No. 3* (E.D.Mich. 1965) 247 F.Supp. 296, 300; *Opinion of the Justices* (1965) 277 Ala. 630 [173 So.2d 793, 796]; *Willows* v. *City of Lewiston* (1969) 93 Idaho 337, 341 [461 P.2d 120].) These cases do not quite go so far as to hold that a state, in establishing municipal annexation procedures, may create classifications which deny the equal protection of the laws. On that propo-sition the Tenth Circuit correctly expresses the rule: "certain it is that a state cannot legislate upon even a matter of complete state interest in such a manner as to abuse a federal constitutional right." (*International Harvester Company* v. *Kansas City* (10th Cir. 1962) 308 F.2d 35, 38; accord, *Adams* v. *City of Colorado Springs* (D.Colo. 1970) 308 F.Supp. 1397, 1401, affd. (1970) 399 U.S. 901 [26 L.Ed.2d 555, 90 S.Ct. 2197].)

purpose;[12] "[on] the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' . . . the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations omitted.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].)[13]

■ The strict standard particularly applies to classifications involving voting rights. The decisions of the United States Supreme Court have established that, "[B]ecause of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause." (*McDonald* v. *Board of Election* (1969) 394 U.S. 802, 807 [22 L.Ed.2d 739, 744, 89 S.Ct. 1404]; accord, *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 336 [31 L.Ed.2d 274, 280-281, 92 S.Ct. 995].) And in *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886], the court, holding invalid a statute limiting the right to vote in school district elections, stated that "we must give the statute a close and exacting examination. '[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and

---

[12]For exposition of the standard of equal protection in cases in which neither fundamental rights nor suspect classifications are involved, see *McDonald* v. *Board of Election* (1969) 394 U.S. 802, 809 [22 L.Ed.2d 739, 745-746, 89 S.Ct. 1404]; *F. S. Royster Guano Co.* v. *Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 990-991, 40 S.Ct. 560].

This standard is illustrated by a collection of cases cited by respondents, exemplified by *Thomas Cusack Co.* v. *City of Chicago* (1917) 242 U.S. 526 [61 L.Ed. 472, 37 S.Ct. 190], and *In re Petersen* (1958) 51 Cal.2d 177 [331 P.2d 24]. *Cusack* upheld a city ordinance providing that no property owners could erect a billboard on his property unless owners of a majority of the frontage on that block consented; *Petersen* upheld an ordinance conditioning designation of exclusive taxi stands upon the consent of the owner of the abutting property. Neither ordinance touched upon a fundamental right nor involved a suspect classification, so the only equal protection issue turned on the question of reasonableness. In fact, in both cases an attack on such ground was so plainly meritless that appellants chose instead to assail the ordinances as unconstitutional delegations of power, but both such attacks failed. *U.S.* v. *Rock Royal Co-Op.* (1939) 307 U.S. 533 [83 L.Ed. 1446, 59 S.Ct. 993], which involved the required producer approval of marketing programs, presented a similar situation.

[13]Accord, *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; see *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831, 836-838 [82 Cal. Rptr. 511].

political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.' *Reynolds* v. *Sims,* 377 U.S. 533, 562 (1964). . . . This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society." (395 U.S. at p. 626 [23 L.Ed.2d at p. 589].)[14]

Respondents contend, however, that section 34311 does not involve voting rights because the section's protest procedure does not provide for an "election." We find it unnecessary to decide whether that procedure constitutes an "election"; our obligation of "active and critical analysis"[15] is not limited to statutes establishing electoral qualifications as such, but extends to laws which "touch upon" or burden the right to vote. Thus the United States Supreme Court has applied the strict equal protection test not only to laws which deny persons the right to vote (e.g., *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]), but also to those which condition voting upon payment of a fee (*Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]), or which dilute the vote of residents of one locality against those of another (e.g., *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]).

In *Williams* v. *Rhodes* (1968) 393 U.S. 23 [21 L.Ed.2d 24, 89 S.Ct. 5], the court applied the "compelling state interest" requirement to a pre-election law which specified procedures for placing candidates on the ballot. The challenged Ohio statutes in that case required new political parties to file petitions signed by 15 percent of the electorate by the February preceding the election, which as a practical matter erected a virtually insurmountable barrier to a new party's placing its presidential electors on the state ballot.

The court in *Williams* observed that "the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." (393 U.S. at p. 30 [21 L.Ed.2d at p. 31].) Accordingly the court inquired into whether the state could claim a compelling interest in restricting these fundamental rights. Ohio contended that its law served

[14]See *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 337 [31 L.Ed.2d 274, 281, 92 S.Ct. 995]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701, 704 [23 L.Ed.2d 647, 650-651, 89 S.Ct. 1897]; *Williams* v. *Rhodes* (1968) 393 U.S. 23, 31 [21 L.Ed.2d 24, 31-32, 89 S.Ct. 5]; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 235-237 [85 Cal.Rptr. 20, 466 P.2d 244].

[15]*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 785 [87 Cal.Rptr. 839, 471 P.2d 487].

both to promote a two-party system and to ensure that the winning electors receive a majority of the votes cast. The court found these objectives insufficient; it concluded that "the State has here failed to show any 'compelling interest' which justifies imposing such heavy burdens on the right to vote and to associate." (*Id.* at p. 31 [21 L.Ed.2d at p. 32].)

Although California predicates the formation of a new city upon a favorable vote in an election in which all adult residents within the proposed boundaries cast one vote each (§§ 34324-34326), section 34311 grants to the landowners within those boundaries the prior power to bar this election. That grant plainly does not proceed upon any theory that the landowners constitute a state administrative agency; the section provides for no hearing before the landowners, no standards for making decisions, and no duty upon any landowner to disregard his own pecuniary interest and cast an impartial vote. To the contrary, the Legislature has clearly endowed landowners with this power because it recognizes that they are individuals who financially and politically are interested in the question of whether a new city should be formed, and thus in whether an election should be called for that purpose.

Section 34311 excludes from its coverage all residents who own no land, although these persons admittedly are also financially and politically interested in whether an election will be called. The section allocates power to the landowners in proportion to the assessed value of their land, so that the persons owning less land, or land of lower valuation, suffer a limitation in power and choice. The allocation, moreover, takes no account of the value of improvements. If one resident owns vacant land worth $40,000, and his neighbor has placed a $30,000 house on land worth $10,000, they pay the same real property taxes, but the resident with *unimproved* land has four times the voice of the other. The statute thus draws a threefold distinction: between those who own land and those who do not, between those who own more valuable land and those owning less valuable parcels, and between owners of unimproved land as against owners of improved land.

Thus section 34311 grants to owners of land, as such, the special power to prevent the incorporation election.[16] They can thereby deny to residents

---

[16]We recognize that the United States Supreme Court at one time acknowledged that a state may constitutionally provide procedures for incorporation of cities in which the issue is never submitted to popular vote. (See *Hunter* v. *Pittsburgh* (1907) 207 U.S. 161, 179 [52 L.Ed. 151, 159, 28 S.Ct. 40]; see also *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339, 342-345 [5 L.Ed.2d 110, 113-116, 81 S.Ct. 125].) But once the state has established an electoral procedure, the constitutional principles relevant to elections apply. Thus in *Hadley* v. *Junior College District* (1970) 397 U.S. 50

the right to vote on the issue of incorporation. Since nonlandowners cannot protest the decisions of the landowners under section 34311, and since the interests of nonlandowners play no part in determining the sufficiency of a protest under that section, the section 34311 procedure may totally deprive them of any voice on the matter of incorporation. ■ We conclude that a statute which confers power to halt an election, and thus to prevent all qualified voters from casting their vote, must be considered to "touch upon" and to "burden" the right to vote, and therefore must be examined under the strict equal protection standards.[17]

4. *Application of the standard of equal protection: the classification of section 34311 does not rest upon a compelling state interest and is not necessary to further any such interest.*

Respondents must demonstrate that the classification of section 34311 meets the strict equal protection standards: that it rests upon a compelling state interest and is necessary to further any such interest. To do so respondents contend that "property owners have a unique interest in the incorporation process" of a city because the exercise of the powers of the city in financing itself by taxing real property and in regulating the use and development of real property may be particularly inimical and disadvantageous to such property owners. The state, they conclude, retains a compelling interest in structuring some procedure to protect this interest of the property owners.

The United States Supreme Court, however, has not accepted the con-

---

[25 L.Ed.2d 45, 90 S.Ct. 791], the Supreme Court applied the one-man, one-vote rule to an elected school board although an earlier case, *Sailors* v. *Board of Education* (1967) 387 U.S. 105 [18 L.Ed.2d 650, 87 S.Ct. 1549], had confirmed that school boards need not be elected. *Phoenix* v. *Kolodziejski* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990], and *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897], required that all registered voters, regardless of their propertied status, be allowed to vote in a bond election; there is, however, no federal constitutional requirement that bond issues obtain electoral approval.

[17]In *Adams* v. *City of Colorado Springs* (D.Colo. 1970) 308 F.Supp. 1397, affd. 399 U.S. 901 [26 L.Ed.2d 555, 90 S.Ct. 2197], the court upheld a Colorado statute providing that when an unimproved area has two-thirds contiguity with an incorporated city, the city may annex that area without an election. The district court rejected the strict scrutiny test on the ground that the case was not one in which "the franchise was granted to one group of persons to the detriment of another group." (308 F.Supp. at p. 1403.) The present case is one of the grant of power to landowners (not to a city or other public agency, as in *Adams* v. *City of Colorado Springs*) to the detriment of residents, and we think it immaterial that the power granted is not the franchise itself, but the right to bar exercise of the franchise. (See Hagman, The Unconstitutionality of Incorporation and Boundary Change Laws as an Impetus for Needed Reform (1970 Institute of Government and Public Affairs, U.C.L.A.).)

tention that property owners and taxpayers, as such, enjoy a special or unique interest that gives them a preferred place in the exercise of the franchise. That court has held unconstitutional the limitation of the franchise in school board elections to owners and lessees of real property and parents of school-age children; it has refused to permit the denial of the franchise to residents of a federal enclave because they do not pay property taxes; it has rejected the restriction of the franchise in bond elections to property holders.

In *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886], the Supreme Court struck down a New York statute which limited the franchise in school board elections to owners and lessees of real property and parents of school-age children. Assuming arguendo that New York could limit the franchise to persons "primarily interested in school affairs," the court nevertheless held the law at issue did not accomplish that purpose. The court concluded that "The issue is whether the § 2012 requirements do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class. The requirements of § 2012 are not sufficiently tailored to limiting the franchise to those 'primarily interested' in school affairs to justify the denial of the franchise to appellant and members of his class." (*Id.* at p. 633 [23 L.Ed.2d at p. 593].) Illustrating the failure of the statute to pivot its discrimination on those "primarily interested," the court pointed out in a footnote that: "For example, appellant resides with his parents in the school district, pays state and federal taxes and is interested in and affected by school board decisions; however, he has no vote. On the other hand, an uninterested unemployed young man who pays no state or federal taxes, but who rents an apartment in the district, can participate in the election." (*Id.* at p. 632, fn. 15 [23 L.Ed.2d at p. 593].)

Following *Kramer,* other cases of the United States Supreme Court have extended this reasoning beyond the context of school board elections. In *Evans* v. *Cornman* (1970) 398 U.S. 419 [26 L.Ed.2d 370, 90 S.Ct. 1752], for example, the high court overturned a Maryland ruling which sought to deny the franchise to residents of a federal enclave upon the ground that they did not pay state property taxes. The court observed that in spite of their nonpayment of such taxes these residents had a stake no less than that of other residents in the quality of state and local government.

Similarly, in *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed. 2d 647, 89 S.Ct. 1897], the court invalidated a Louisiana statute which precluded all but property taxpayers from participating in an election called to approve the issuance of revenue bonds by a municipal utility.

The court pointed out that even though a state could perhaps constitutionally limit the franchise to qualified voters who are "specially interested" in such an election, property taxpayers were not the sole persons "specially interested" in revenue bond elections. Emphasizing that "the benefits and burdens of the bond issue fall indiscriminately on property owner and nonproperty owner alike," (*id.* at p. 705 [23 L.Ed.2d at p. 651]) the *Cipriano* court concluded that the statute before it did not meet the " 'exacting standard of precision we require of statutes which selectively distribute the franchise.' *Kramer* v. *Union Free School District. . . .*" (*Id.* at p. 706 [23 L.Ed.2d at p. 652].)

In *Phoenix* v. *Kolodziejski* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990], the City of Phoenix sought to defend Arizona's limitation of the franchise in bond elections to property owners on the grounds that the bonds in question were general obligation bonds, and might constitute a lien on real property. The United States Supreme Court rejected this contention, pointing out "that all residents of Phoenix, property owners and nonproperty owners alike, have a substantial interest in the public facilities and the services available in the city and will be substantially affected by the ultimate outcome of the bond election at issue in this case." It held that "[p]lacing such power in property owners alone can be justified only by some overriding interest of those owners that the State is entitled to recognize." (*Id.* at p. 209 [26 L.Ed.2d at pp. 527-528].) The court then explained that even assuming that the bonds were paid entirely by real property taxes, this assumption would still not justify a limited franchise, for the burden of real property taxes falls not only upon the owners of the land, but also upon their tenants, who pay higher rents, as well as upon their customers, who must pay higher prices. It concluded that "although owners of real property have interests somewhat different from the interests of nonproperty owners in the issuance of general obligation bonds, there is no basis for concluding that nonproperty owners are substantially less interested in the issuance of these securities than are property owners." (*Id.* at p. 212 [26 L.Ed.2d at p. 529].)

Finally, in *Stewart* v. *Parish School Bd. of Parish of St. Charles* (E.D.La. 1970) 310 F.Supp. 1172 the federal district court held unconstitutional a Louisiana statute which limited the franchise in school bond elections to landowners, and allocated votes on the basis of assessed value. The Supreme Court affirmed per curiam, citing *Phoenix* v. *Kolodziejski.* (See 400 U.S. 884 [27 L.Ed.2d 129, 91 S.Ct. 136].)[18]

---

[18]See also *Turner* v. *Fouche* (1970) 396 U.S. 346 [24 L.Ed.2d 567, 90 S.Ct. 532], holding that the Georgia requirement that members of county boards of education be "freeholders," i.e., landowners, denied equal protection to nonlandowning residents of the county.

Contrary to respondents' contention, we do not find that this line of authority has been vitiated by the Supreme Court's decision in *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889], which upheld the requirement of a 60 percent majority for approval of bond issues. *Gordon* v. *Lance* expressly *reaffirmed Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897], stating that *"Cipriano* was no more than a reassertion of the principle, consistently recognized, that an individual may not be denied access to the ballot because of some extraneous condition, such as race, . . .; wealth [citing *Harper* v. *Virginia Board of Elections* (1966) 383 U.S. 663]; tax status [citing *Kramer* v. *Union Free School Dist.* (1969) 395 U.S. 621]; . . . or military status, . . ." (403 U.S. at p. 5 [29 L.Ed.2d at p. 276].) In a footnote particularly pertinent to the present case, the court explained that "[w]hile *Cipriano* involved a denial of the vote, a percentage reduction of an individual's voting power in proportion to the amount of property he owned would be similarly defective." (*Id.* at p. 4, fn. 1 [29 L.Ed.2d at p. 276].) Thus although *Gordon* v. *Lance* upheld the requirement for an extraordinary majority in bond elections on the ground that "such provisions do not discriminate against . . . any identifiable class" (*id.* at p. 7 [29 L.Ed.2d at p. 277]), the court's opinion demonstrates its continued adherence to the position that those who own no land, or pay no property taxes, constituted identifiable classes which cannot be excluded. The case presented *no question of classification of voters or "discrimination against any iden-tifiable class" (id.),* but only of the quantification of votes required to incur public indebtedness.

Turning from federal to California cases, respondents contend that the Court of Appeal decision in *Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831 [82 Cal.Rptr. 61], established the validity of a voting system based on assessed value of land. *Schindler* upheld that method of selection of the board of trustees of an irrigation district on the ground that "the benefits and burdens accrue to each landowner in proportion to the extent of land owned." (1 Cal.App.3d at p. 839; see also *Thompson* v. *Board of Directors* (1967) 247 Cal.App.2d 587, 593-594 [55 Cal.Rptr. 689].)[19] The court pointed out that "[t]he state clearly has a compelling

---

[19]In *Burrey* v. *Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 682, fn. 8 [97 Cal.Rptr. 203, 488 P.2d 395], we noted that *Schindler* v. *Palo Verde Irrigation Dist.* "may be difficult to reconcile with the Supreme Court cases on this subject, particularly *Kolodziejski*, which was decided after *Schindler.* (See *Girth* v. *Thompson* (1970) 11 Cal.App.3d 325, 330 [89 Cal.Rptr. 823].)" We concluded, however, that "since irrigation districts are substantially different from the EMID— their powers are fewer and more limited to the particular purpose for which the districts were created—we do not reach that question here."

The applicability of the one-man, one-vote rule to special districts is presently

interest in the reclamation of waste lands through flood protection, drainage and irrigation works." Furthermore, the lands which were to be reclaimed were virtually uninhabited. The court concluded that the "grant of election franchise to land owners, resident and nonresident, corporate and individual, is necessary to 'further a compelling state interest.'" (1 Cal.App.3d at p. 839.)

In contrast to the irrigation district, which is composed of landowners who pursue their special interests in the reclamation of their land, the City of Rancho Palos Verdes consists of those who pursue the overall interests of citizens in their government. Rancho Palos Verdes will constitute a city of general governmental powers; its actions plainly concern nonlandowners as well as landowners; neither the benefits of city government nor its burdens can fairly be said to be directly proportional to the assessed value of land or to the special interests of landowners. (See *Burrey* v. *Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 682, fn. 8 [97 Cal.Rptr. 203, 488 P.2d 395].)[20]

---

before the Supreme Court in the case of *Associated Enter., Inc.* v. *Toltec Watershed Imp. Dist.* (Wyo. 1971) 490 P.2d 1069, prob. juris. noted (1972) 407 U.S. 908 [32 L.Ed.2d 681, 92 S.Ct. 2432].) The Wyoming Supreme Court in this case had held that an election to establish a watershed district could be limited to landowners because the activities of the district were primarily proprietary instead of governmental.

[20]In *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863 [99 Cal.Rptr. 710], the Court of Appeal upheld the constitutionality of Streets and Highways Code sections 2390 and 10311, which provide for termination of assessment proceedings upon protest by the owners of a majority of the land area to be assessed. The case involved the construction of gas pipelines to serve 690 properties in the county. Only those properties were subject to assessment for the improvement, and only the owners of properties subject to the assessment were entitled to file protests. Under these circumstances, the Court of Appeal concluded that "[s]ince only those landowners who are directly benefited are charged with the cost of the improvements in proportion to the benefit conferred and since land area bears some reasonable relationship to the amount of the assessment, there is a rational basis for making the governmental decision subject to landowners' protest and in measuring the sufficiency of the protest by the land area protested." (22 Cal.App.3d at p. 876.)

The present case differs from *County of Riverside* v. *Whitlock* in three respects. First, the formation of a city has an important effect upon *all* residents within its boundaries; the decision to levy assessments in *County of Riverside* v. *Whitlock* "is not one which affects all citizens in the county in 'important ways'; within the 'district' the impact on the landowners to be assessed is 'disproportionate' to any remote effect it may have on resident nonlandowners; . . ." (22 Cal.App.3d at p. 876.) Second, in contrast to *County of Riverside* v. *Whitlock,* the method of measuring the protest in the present case bears no rational relationship either to the benefits to be derived from the formation of a city, nor to the burdens imposed. (See *post* at p. 965.) Third, the landowner protest in the present case acts as a veto to bar residents from voting in an incorporation election; the assessments at issue in *County of Riverside* v. *Whitlock* do not require voter approval, and the protest in that case does not bar any subsequent election.

In this connection respondents lay particular emphasis on special districts of limited powers, pointing to some 42 statutes which restrict the right to sign petitions or instruments of protest to landowners. We point out that for the most part these statutes involve special districts that cater to, and express, special interests. Our holding in the instant case pertains to the validity of a restricted franchise as to the formation of a city of general powers and does not necessarily apply to special districts, whose design, powers and methods of financing are more closely related to ownership of land. (See *Avery* v. *Midland County* (1968) 390 U.S. 474, 484 [20 L.Ed. 2d 45, 53, 88 S.Ct. 1114].)

■ From our review of these cases we draw a general principle: that all residents share a substantial interest in the government of their state, city, county, school district, and other agencies of general governmental power, and in the issuance of bonds by these entities. Consequently the special concern of the landowners as to the level of taxes upon real property cannot justify exclusion of the nonlandowner nor the proportionate reduction of the vote of owners of less valuable property.

Respondents, however, observe that the present case differs from all previous cases in that it involves the creation of a new governmental entity and that it arguably does not involve a vote upon a restricted franchise. Neither distinction renders the stated general principle inapplicable to the present case.[21] We can discern no reason, and respondents suggest none, why landowners enjoy a greater interest, or nonlandowners a lesser interest, in the formation of a city of general powers than in its governance, or its issuance of general obligation bonds. Nor do we find a reason, and again respondents suggest none, why the interest of landowners becomes more compelling, more worthy of special protection, in a protest proceeding than in an election.

We conclude that the principle established in *Kramer, Cipriano, Kolodziejski,* and other cases applies fully to the present case. Nonlandowners share an equal interest with landowners in the formation of a city which

---

[21]Respondents quote *Gray* v. *Sanders* (1963) 372 U.S. 368, 379 [9 L.Ed.2d 821, 829-830, 83 S.Ct. 801], that "[O]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . ." They reason that until the unit is designated—which they equate with the incorporation of the city—an *un*equal vote is permitted. To interpret these words from *Gray* v. *Sanders* as a mandate for unequal voting is to reach an interpretation far beyond the intent of the Supreme Court in that case. In any event, we face here the issue of equal protection in connection with the incorporation election; for purposes of that election the relevant geographical unit *is* designated by the decision of the local agency formation commission, subject to later change by the board of supervisors.

could provide police and fire protection, maintain roads, acquire and develop parks, and furnish other public services. Moreover, cities derive revenue from many sources besides property taxes.[22] Property taxes are levied on land and improvements, not land alone, and their burden includes tenants as well as landowners. Zoning laws and land use regulations affect not only the landowner but his neighbors; and their direct effect on the landowner cannot be measured in terms of assessed value. ■ Thus no compelling state interest requires that nonlandowners be excluded from the group empowered to decide whether an election to incorporate a city be called, and no compelling interest is served by allocating power within that group on the basis of assessed value of land.

We turn now to respondents' final contention that both residents *and* landowners have an interest in the subject of incorporation; that since only residents may vote in the incorporation election, section 34311 is necessary to give the landowners a voice on the issue of incorporation. In other words, they argue that the California statutory plan does not exclude any interested person, but instead conditions the formation of a city upon the concurrent approval of the two interested groups—the residents who vote in the incorporation election, and the landowners who express their views in the protest procedure of section 34311.

The concept of concurrent majorities is not much discussed in the cases.[23] Two decisions have held state constitutional provisions requiring concurrent geographical majorities invalid under the Fourteenth Amendment. *State* v. *State Canvassing Bd.* (1968) 78 N.M. 682 [437 P.2d 143], held invalid a provision requiring a two-thirds favorable vote in each county to amend the New Mexico Constitution. In *Holt* v. *Richardson* (D.Hawaii 1965) 238 F.Supp. 468 the court struck down a provision of the Hawaii Constitution which required a separate majority of the votes in each of a majority of the counties in order to apportion the Hawaii State Senate.[24]

[22]"In 1968/69, California cities on the average received only 32 percent of their general city revenue from the general property tax. In the nation, considering all forms of local government in Standard Metropolitan Statistical Areas, the average government in those areas received only 44.6 percent of its revenue from property taxes, and received 32.4 percent of its revenue by way of intergovernmental transfers from the state or federal governments. In Los Angeles County, 23 of the 77 cities have no city property taxes whatever." (Hagman & Disco, *supra,* 2 Urban Law. at p. 464 (fns. omitted).)

[23]One law review article, Hagman & Disco, *supra,* 2 Urban Law. 459, 470-472, is the only work we have discovered which discusses the constitutionality of laws requiring a concurrent majority of residents and landowners.

[24]Cf. *Gray* v. *Sanders* (1963) 372 U.S. 368 [9 L.Ed.2d 821, 83 S.Ct. 801], which held the Georgia county unit electoral system unconstitutional. The Georgia system

More closely on point is the argument of Mr. Justice Stewart's dissenting opinion in *Phoenix* v. *Kolodziejski* (1970) 399 U.S. 204, 215 [26 L.Ed.2d 523, 531, 90 S.Ct. 1990]. He argued that the Arizona law limiting the franchise in bond elections to owners of property did not really exclude nonowners from the vote because the bonds could not be issued unless approved by a majority of the city council, who were selected on a one-man, one-vote basis—in other words, that Arizona required for bond issues a concurrent majority consisting of residents, acting through their elected representatives, and property owners. The rejection of this argument, without discussion, by the majority opinion in *Kolodziejski,* however, apparently signifies the Supreme Court's disagreement with the concurrent majority theory.

Nevertheless, Supreme Court decisions to date do not automatically mandate the unconstitutionality of state laws providing for concurrent majorities, and we must therefore inquire whether such provisions in the present case are necessary to serve a compelling state interest. Insofar as the state interest lies in protecting the interests of individual resident landowners, the answer is clear; these landowners can vote in the incorporation election, and we see no compelling reason to afford them *two* opportunities to express their disapproval of the proposed incorporation.

Respondents point out, however, that nonresident landowners also have an interest in whether the city shall be incorporated, but have no right to vote in the incorporation election. Section 34311, however, cannot be upheld upon a theory that it is necessary to secure a state interest in giving nonresident landowners a voice in incorporation. The problem is that section 34311 does not merely grant such landowners a concurrent voice in the incorporation of a city; it gives them a veto.[25] Yet it is the residents of a region, not the nonresident landowners, who as a class are the more deeply concerned with its government. (*Burrey* v. *Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 682 [97 Cal.Rptr. 203, 488 P.2d 395]; see Hagman & Disco, *supra,* 2 Urban Law., at p. 464.) The residents have

allocated votes among the counties on a population basis but was weighted to favor less populous counties; the candidate receiving a majority in a county then received the entire vote allocated that county. See also *Lucas* v. *Colorado Gen. Assembly* (1964) 377 U.S. 713 [12 L.Ed.2d 632, 84 S.Ct. 1472], and *Reynolds* v. *Sims* (1964) 377 U.S. 533, 575-576 [12 L.Ed.2d 506, 535-536, 84 S.Ct. 1362], which held that a state cannot apportion one house of its legislature on a population basis and one on a territorial basis. *Keane* v. *Golka* (D.Neb. 1969) 304 F.Supp. 331, on the other hand, upheld a law requiring majorities in each school district in an election to reorganize and consolidate the districts.

[25]Cf. *Reynolds* v. *Sims, supra,* 377 U.S. at page 566 [12 L.Ed.2d at page 530]: "Our constitutional system amply provides for the protection of minorities by means other than giving them majority control . . . ."

a constitutional right to vote in municipal elections (*Avery* v. *Midland County* (1968) 390 U.S. 474, 476 [20 L.Ed.2d 45, 48-49, 88 S.Ct. 1114]); the nonresident landowners have no such right (see *Chadwell* v. *Cain* (1959) 169 Ohio St. 425, 431 [8 Ohio Ops.2d 449, 160 N.E.2d 239]). ■ It is open to question whether the state can give nonresidents a vote equivalent to that of residents; we entertain no doubt that the state cannot enact a provision which gives absentee and corporate landowners the power to *override* the needs and interests of the residents.

■ Moreover, section 34311 allocates power among the landowners in a manner which bears no rational relationship to any state interest.[26] Despite respondents' concern for property taxes, the fact remains that such taxes are levied on the assessed value of land *and* improvements, not land alone.[27] ■ By distributing voting power on the basis of assessed value of land alone, section 34311 grants disproportionate power to ranchers and developers who own large tracts of land, and less weight to residents and businesses who own small developed parcels. We perceive no rational basis for this discrimination, and no legitimate state purpose to be served.[28]

---

[26]Consequently, section 34311 is unconstitutional in part even when examined under the more liberal "rational relationship" test applied to classifications which are not suspect and do not affect fundamental rights (see fn. 12, *supra*).

[27]See discussion in Hagman & Disco, *supra*, 2 Urban Law., at page 464.

[28]Respondents' attempt to rationalize this discrimination is ingenious but unconvincing. They do not contend that the present value of land is itself a reasonable measure of a landowner's interest, but argue that the present land value portends the future value of land and improvements. They assert: "The Legislature must be presumed . . . to have found that in the normal course of events, vacant land will be improved, . . . that there is a positive correlation between the values of various parcels of land and the values of such parcels as improved from time to time during the existence of the city." Giving the example of two parcels, one with vacant land worth $25,000 and another with improved land worth $25,000, they argue that it is "probable" that the vacant land will be improved, for example, with a building worth $100,000. Respondents conclude that "if petitioners' contentions were sustained, this owner of the $125,000 property would have no more say than the 'homeowner' whose property is worth but $25,000 merely because of the fortuitous circumstance that at the time of the assessment in effect at the date of the hearing he has not yet built."

This argument is invalid unless one adds an additional and a very doubtful presumption that the man who now owns the unimproved land will continue to own that land after it is improved. But even after this array of questionable presumptions, the argument still lacks rationality. Certainly some vacant land will be improved, but during that period of time some improved land will be converted to other improvements, some improvements will appreciate and some depreciate, various persons will die or move away and others will attain majority or acquire property. The Legislature could not rationally believe or presume that the present value of land accurately predicts the true future value of land and improvements for the area for all times extending into the indefinite future, nor that the present owners

5. ■ *The unconstitutional provisions in section 34311 are severable from the remainder of that section and from the other provisions of division 2 of title 4 of the Government Code.*

■ As stated in *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 238 [18 Cal.Rptr. 501, 368 P.2d 101], "The test of severability is whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the statutory scheme, or the utility of the remaining provisions."[29] The invalidation of section 34311—except the first sentence, which provides simply that the board of supervisors shall hold a hearing—will leave a viable statutory scheme for the incorporation of cities, consisting of application to, and approval by, the local agency formation commission; petition to the board of supervisors;[30] hearings before that board; and an incorporation election. The elimination of the special veto powers of landowners does not destroy the whole statutory scheme or the remaining portions of the statute.

We may reasonably presume that the Legislature would prefer to preserve a procedure for the incorporation of cities in California, absent the landowner veto provision, rather than totally to eliminate such procedure so that no city at all could be incorporated. (See *Franklin Life Ins. Co.* v. *State Board of Equalization* (1965) 63 Cal.2d 222, 229 [45 Cal.Rptr. 869, 404 P.2d 477].)

---

of unimproved land suitably represent the interests of the future owners of improved land. We doubt that the Legislature intended such an exotic method of evaluating the landowners' interest; it is more plausible that the Legislature simply intended to effect an unconstitutional discrimination in favor of owners of unimproved land and against owners of small improved lots.

[29]Government Code section 23 states that "If any provision of this code, or the application thereof to any person or circumstance, is held invalid, the remainder of the code, or the application of such provision to other persons or circumstances, shall not be affected thereby." "The rule is well settled, where such a severability clause is included, that the valid portion of a statute or ordinance which is partially unconstitutional will be upheld if the remaining portion is severable and constitutes a completely operative expression of the legislative intent." (*In re Portnoy* (1942) 21 Cal.2d 237, 242 [131 P.2d 1]; see also *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].)

[30]Section 34303 provides that proceedings before the board of supervisors are initiated by a petition signed by at least 25 percent of the landowners representing at least 25 percent of the assessed value of land. (See fn. 4, *supra.*) We perceive no constitutional objection in permitting a group composed of 25 percent or more of the landowners, whether or not they represent 25 percent of the value of land, to initiate incorporation proceedings, and consequently we find no constitutional impediment to the board of supervisors acting on the petition for incorporation of Rancho Palos Verdes. We note that serious constitutional issues may arise from the failure of section 34303 to permit incorporation proceedings to be initiated by 25 percent of the residents, without regard to their ownership or value of land; such issues, however, are not before us in the present action.

## 6. Conclusion

The practical effect of the classification of section 34311 is that a city cannot be formed in Rancho Palos Verdes, or in many other areas of the state, without the tacit consent of the relatively few owners of large tracts of land. The present case presents a spectacle where the desires of the 63 percent of the resident landowners who signed the petition for incorporation would be overridden by a protest composed primarily of nonresident and absentee corporate owners. Thus under a literal application of section 34311 the right of the residents of a region to self-government, to establish and enjoy the amenities of civic life, would be subordinated to a few persons whose economic interests lie in maintaining low property taxes and lax land use regulations. The perpetuation of this condition cannot realistically nor constitutionally be described as a compelling interest of the State of California.[31]

The philosophic reach of the decisions of the United States Supreme Court has been to afford to each individual citizen a maximum democratic participation in political matters upon an equal basis. The decisions have intimated that special voting rights, premised upon such criteria as land ownership, may be afforded, if at all, only to those who have been able to demonstrate a special and unique interest that justifies such extraordinary status. To meet the standards of the equal protection of the laws a statute so classifying voters must rest upon a compelling state interest and must be necessary to further any such interest. In the instant case the interest of the property owners is not so unique that such owners acquire some special status; their interest merges with the interests of the citizens as a whole.

The ideal of maximum participation in democratic decision-making particularly applies to participation in the affairs of the city. One of the most striking and encouraging phenomena of our times has been the

---

[31]Our holding that the protest procedure of section 34311 is unconstitutional does not leave the nonresident or corporate landowner bereft of statutory protection. He may appear before the local agency formation commission to oppose incorporation and request exclusion from the proposed city (§ 54795). These commissions may, and often do, disapprove unsound incorporation proposals or require the revision of proposed boundaries. (See Goldbach, Boundary Change in California: the Local Agency Formation Commissions (1970, Inst. of Governmental Affairs, U.C. Davis).) The landowner may again appear before the board of supervisors to oppose incorporation or request exclusion (§§ 34311, 34315). Finally, if his lands are agricultural he may be able to avoid any tax increase by contracts or agreements under the California Land Conservation Act of 1965. (§ 51200 et seq.)

The difference between these remedies and the protest procedure of section 34311 is that they confer upon the landowner no right to veto incorporation, but extend to him only the opportunity to persuade a public body that nonincorporation, exclusion, or lower taxation is in the public interest.

deep and renewed interest of citizens in local community matters. To frustrate the endeavor of individuals to fix the unit of their local governance and to repose that power in land, not people, would be to stifle that self-determination. The seeds of democracy lay in the Greek city-state; we would be reluctant to stay the fruition of that democratic expression in the city of today. Neither the state nor federal Constitution sanctions such negation; each compels the opposite.

The peremptory writ of mandate as prayed shall issue.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

The petition of respondents Somers and Great Lake Properties, Inc. for a rehearing was denied October 25, 1972.