[No. B051229. Second Dist., Div. Two. Nov. 28, 1990.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DAVID PAUL BRADFORD, Real Party in Interest.

974

COUNSEL

James E. Holst, Christine Helwick, Gary Morrison, David M. Birnbaum, Melvin W. Beal, McKenna & Cuneo, Charles Pereyra-Suarez, Barbara J. Hensleigh, Alison E. Daw, McKenna & Fitting and Aaron M. Peck for Petitioners.

Robert Rubin, Peter Roos and Susan E. Brown as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Knickerbocker & Reed and Richard L. Knickerbocker for Real Party in Interest.

## OPINION

KLEIN (B.), J.*—By law, California's public colleges and universities charge lower tuition for California residents than for nonresidents. (See Ed. Code, §§ 68050-68051.) At one time, students who were not United States citizens were classified by statute as nonresidents unless they were "lawfully admitted to the United States for permanent residence in accordance with all applicable laws of the United States." (Former Ed. Code, §§ 68076-68077, repealed 1983.)

In 1982, however, in a suit by alien University of Maryland students whose parents were admitted to this country as employees of official international organizations, the Supreme Court of the United States ruled that when federal immigration law authorizes a particular classification of nonimmigrant aliens to establish domicile in the United States, a state university is precluded, under the supremacy clause, from refusing to regard them as residents. (*Toll* v. *Moreno* (1982) 458 U.S. 1 [73 L.Ed.2d 563, 102 S.Ct. 2977].)

Accordingly, in 1983 our Legislature amended the Education Code to eliminate the requirement that alien students seeking the benefits of resident tuition must show they were lawfully admitted for permanent residence. (Stats. 1983, ch. 680, § 1, p. 2636.) A new rule was substituted: an alien student may be classified as a resident for tuition purposes "unless precluded by the Immigration and Nationality Act (8 U.S.C. 1101, et seq.) from establishing domicile in the United States." (Ed. Code, § 68062, subd. (h).)

The Chancellor of the California State University asked the Attorney General whether, under this new statute, "undocumented aliens"—i.e., noncitizens who lack valid visas, having entered or remained in the United States in violation of federal immigration law—are precluded from

---

* Assigned by the Chairperson of the Judicial Council.

qualifying as California residents for tuition purposes. In June 1984 the Attorney General published his formal opinion that undocumented aliens are, under the statute, considered nonresidents. (67 Ops.Cal.Atty.Gen. 241 (1984).)

Two months later several undocumented alien students filed an action in the Superior Court of Alameda County seeking to establish that Education Code section 68062, subdivision (h), as interpreted by the Attorney General, violated article I, section 7 of the California Constitution, which guarantees every person equal protection of the laws. In June 1985, after trial, the court ruled in the students' favor and permanently enjoined the University of California and the California State University and College System from treating all undocumented alien students as nonresidents for tuition purposes.[1]

A trial court declaration that a state statute is unconstitutional does not bind state agencies or officials. To the contrary, a state agency is forbidden to refuse to enforce a statute thought to be unconstitutional unless an appellate court has so determined. (Cal. Const., art. III, § 3.5.) Nonetheless, the university defendants elected to comply with the Alameda County injunction without testing its validity by taking an appeal.

Subsequently, the action which is the subject of the present petition was commenced, in the Superior Court of Los Angeles County, by David Paul Bradford. Bradford, an employee of the University of California at Los Angeles assigned to determine the residency status of students, was invited to resign after he evinced unwillingness to comply with the ruling of the Alameda County court. In his lawsuit, Bradford asked that the University of California be required to comply with Education Code section 68062, subdivision (h), as interpreted by the Attorney General.

The university moved for summary judgment or for summary adjudication of the dispositive issues. The trial court denied these motions on January 10, 1990. The university renewed its motions, again asking the trial court to rule summarily that Education Code section 68062 (hereafter section 68062) does not require the university to consider alien students' immigration status in determining whether they are residents. Bradford filed his own motion requesting a summary ruling that section 68062 was correctly interpreted by the Attorney General and is constitutionally valid.

---

[1] The residency statutes, including section 68062, are applicable to the University of California only to the extent its Regents adopt them. (See Ed. Code, § 68134.) On September 21, 1984, the Regents adopted section 68062, subdivision (h), with the immaterial exception of the redundant phrase, "including an unmarried minor alien."

On May 30, 1990, the trial court ruled against the university and in favor of Bradford.

The university immediately altered its tactics and filed a motion to dismiss the action or, in the alternative, to transfer it to the Superior Court of Alameda County for consolidation with the earlier litigation, in which final judgment had been entered five years earlier.

The trial court denied this motion on June 22, 1990. In the course of argument on the motion, the court summarized its view as follows: "You have this action pending in this court. You litigate it through to a decision against you, and then, at that point, you claim that the court should yield its jurisdiction because there's another action that is still pending, in essence, up in Alameda County . . . . It doesn't seem to me that there is any sound rule of judicial policy that would permit a litigant to do that."

The university then filed the present petition for a writ of mandate or prohibition to overturn the trial court's May 30 or June 22 rulings, or both. At the Supreme Court's direction, we issued an alternative writ.

*1. The trial court did not abuse its discretion in declining the university's request to transfer the action to Alameda County.*

■ In urging that the trial court is powerless to entertain this action because the Alameda County action dealt with the same subject matter, the university relies on the well-established principle that one court of the state may not interfere with another court's exercise of its own jurisdiction. (E.g., *Anthony* v. *Dunlap* (1857) 8 Cal. 26 [District Court of the Fifth Judicial District has no power to enjoin enforcement of a judgment entered in the Sixth Judicial District].) The university further invokes the rule of priority of jurisdiction: where several courts have concurrent jurisdiction over a certain type of proceeding, the first one to assume and exercise such jurisdiction in a particular case acquires an exclusive jurisdiction. (E.g., *Browne* v. *Superior Court* (1940) 16 Cal.2d 593 [107 P.2d 1, 131 A.L.R. 276] [guardian administering the affairs of a conservatee under instructions of the Superior Court of Santa Barbara County should not be subjected to instructions on the same subject by the Superior Court of the City and County of San Francisco].)

Whether an action would work a true interference with another court's jurisdiction, and whether one court should yield priority of jurisdiction to another, are, of course, questions which can be determined only from an examination of the particular case. Here, myriad reasons supported the trial

court in its decision not to dismiss the action or transfer it to the Superior Court of Alameda County. Bradford was not a party to the Alameda County action; Bradford and his counsel are located in Los Angeles; Bradford's employment was terminated in Los Angeles, and the witnesses are there; the university was content to submit the case to the Los Angeles court twice for adjudication on the merits; the university filed its motion to dismiss or transfer only after the Los Angeles court twice rejected its position on the merits and sustained Bradford's position (see *California Fed. Sav. & Loan Assn.* v. *Superior Court* (1987) 189 Cal.App.3d 267 [234 Cal.Rptr. 413]); the action was already several years old when the university moved to dismiss or transfer it; the Los Angeles action cannot affect the Alameda County injunction against the California State University, which is not a party to Bradford's action; the theoretical danger that either trial court might hold the university in contempt for obeying the other trial court's injunction, and that the appellate courts would permit such an absurdity, is realistically nonexistent; the Alameda action came to final judgment five years ago (see *Browne* v. *Superior Court, supra,* 16 Cal.2d at p. 597); Bradford could participate in the Alameda case only by the bizarre procedure of requesting leave to intervene in order to petition to vacate the judgment; the university did not appeal the Alameda County injunction; the Alameda court's decision is of little legal significance because only an appellate court can make a binding ruling; the issue raised should be settled by an appellate court; and it makes no discernible difference whether it is decided in the First or the Second Appellate District. In addition, at oral argument on this writ petition, the university expressed its wish that this court decide the merits of the tuition issue.

Under these circumstances, we find no absolute bar to the trial court's jurisdiction, and no abuse of discretion in its denial of the university's motion to dismiss or transfer the case.

*2. Section 68062 precludes undocumented alien students from being classified as residents for tuition purposes.*

Section 68062, subdivision (h), provides that an alien can be a resident student for tuition purposes "unless precluded by the Immigration and Nationality Act . . . from establishing domicile in the United States."

■ The university advances a clever formal proof that this statute does not classify undocumented aliens as nonresidents. Federal immigration law classifies all noncitizens into two groups: immigrant aliens and nonimmigrant aliens. (8 U.S.C. § 1101(a)(3), (15).) All aliens are immigrants except those who fall into one of 14 classes of nonimmigrants. (*Id.,*

§ 1101(a)(15)(A)-(J).) Examples of the 14 classes of nonimmigrant aliens are diplomats, tourists, business travelers, students, foreign press correspondents, passengers in transit, and ships' crews. In certain of these classifications (e.g., tourists, business travelers, and students) the nonimmigrant is required to maintain a residence in a foreign country with no intention of abandoning it. (*Id.*, § 1101(a)(15)(B), (F).) Other classes of nonimmigrants are not required to maintain a residence abroad. For example, foreign residence is not required for officers and employees of recognized international organizations or members of their immediate families, as in *Toll* v. *Moreno, supra*; there the students' parents were employed by the Inter-American Development Bank and the International Bank for Reconstruction and Development. (See 8 U.S.C. § 1101(a)(15)(G)(iv).) Aliens who maintain a foreign residence they do not intend to abandon cannot also be residents of California, for a person can have only one residence. (Ed. Code, § 68062, subd. (a); Gov. Code, § 244, subd. (b).)

The immigration statute omits to mention undocumented persons in this classification scheme. Hence, the university contends, undocumented aliens do not fall into any class of nonimmigrant aliens required by the federal statute to maintain a residence abroad. Not being required to maintain a residence abroad, the argument continues, undocumented aliens are free to establish their residence in California. Therefore undocumented aliens are not "precluded by the Immigration and Nationality Act from establishing domicile in the United States." *Quod erat demonstrandum.*

This reasoning is Daedalian but unpersuasive. Federal law forbids aliens to enter the United States without applying for admission. (8 U.S.C. §§ 1101(a)(4), 1181(a), 1201.) Those who nonetheless succeed in doing so, or in overstaying their visas, are subject to arrest and deportation. (*Id.*, §§ 1251, 1252, 1357.) Similar sanctions await those who procure admission by fraud. (*Id.*, §§ 1182(a)(19), 1251.) It is unremarkable that Congress, in organizing various classifications of lawfully admitted nonimmigrant aliens, reserved no classification for aliens who have entered or remained in this country unlawfully. We do not interpret the federal immigration statutes, therefore, as authorizing, or not precluding, the establishment of domicile here by those whose very presence is unlawful. It would be senseless so to interpret section 68062, subdivision (h).

We find distinguishable a 1980 decision holding an undocumented alien qualified to receive benefits under a statute that provides compensation for crime victims who are "residents of California." (*Cabral* v. *State Bd. of Control* (1980) 112 Cal.App.3d 1012 [169 Cal.Rptr. 604].) That case, unlike

the present one, arose under a statute which contains no definition of the term "resident."

The legislative history of subdivision (h) firmly supports our interpretation of section 68062. The pertinent legislative documents are surveyed in the Attorney General's published opinion, which is attached as an appendix to this opinion. These committee summaries, staff analyses, and official digests demonstrate that subdivision (h) was intended to permit only legally admitted alien students to qualify as residents for tuition purposes.

Accordingly, we hold that section 68062, subdivision (h), precludes undocumented alien students from qualifying as residents of California for tuition purposes.

*3. So construed, subdivision (h) is constitutional.*

■ The university contends the statute, as construed by the Attorney General—and by this court—deprives undocumented alien students of the equal protection of the laws. The university and amici curiae argue the law discriminates against the poor, senselessly deprives good students of a post-secondary education, and furthers no substantial state interest.

It would serve no purpose to recite in detail the familiar principles governing an equal protection analysis. (See, e.g., *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 798-799 [187 Cal.Rptr. 398, 654 P.2d 168]; *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 951-952 [104 Cal.Rptr. 297, 501 P.2d 537]; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; see *Plyler* v. *Doe* (1982) 457 U.S. 202, 216-218 [72 L.Ed.2d 786, 798-800, 102 S.Ct. 2382].) We are unaware of any authority forbidding a state, on equal protection grounds, to provide services to its lawful residents that it denies to others. California law withholds from undocumented aliens fundamental political, economic, and social privileges. They cannot vote, cannot work, and are ineligible for public assistance, free medical care, and unemployment compensation. (See Cal. Const., art. II, § 2; *De Canas* v. *Bica* (1976) 424 U.S. 351 [47 L.Ed.2d 43, 96 S.Ct. 933]; Welf. & Inst. Code, §§ 11104, 14007.5; Unemp. Ins. Code, § 1264; Cal. Code Regs., tit. 22, §§ 50301, 50302.)

Federal law, too, discriminates against undocumented aliens in the most basic way: it forbids their entry into the country and authorizes their arrest and deportation. Even undocumented aliens given preferred status under federal law—those authorized under the Immigration Reform and Control

Act of 1986 to become lawful temporary residents and thereafter permanent residents—are disqualified for five years from most federal programs of financial assistance to the needy. (8 U.S.C.§ 1255a(h).) If federal financial assistance may be withheld from newly legalized aliens who, under the 1986 amnesty law, " 'are to be welcomed as full and productive members of our nation' " (*California Rural Legal Assistance, Inc.* v. *Legal Services Corporation* (9th Cir. 1990) 917 F.2d 1171, 1178), surely the state is not constitutionally required to subsidize the university education of other aliens who have never legalized their status.

In comparison with these fundamental rights and privileges denied undocumented aliens by state and federal laws, the privilege withheld here—subsidized public university education—is considerably less significant. Further, California also denies this subsidy to citizens of neighboring states and to aliens holding student visas; yet the state has substantial and legitimate reason to favor both these groups over undocumented aliens, rather than the reverse.

The state's legitimate interests in denying resident tuition to undocumented aliens are manifest and important. We will name just a few: the state's interests in not subsidizing violations of law; in preferring to educate its own lawful residents; in avoiding enhancing the employment prospects of those to whom employment is forbidden by law; in conserving its fiscal resources for the benefit of its lawful residents; in avoiding accusations that it unlawfully harbors illegal aliens in its classrooms and dormitories; in not subsidizing the university education of those who may be deported; in avoiding discrimination against citizens of sister states and aliens lawfully present; in maintaining respect for government by not subsidizing those who break the law; and in not subsidizing the university education of students whose parents, because of the risk of deportation if detected, are less likely to pay taxes.

*Plyler* v. *Doe, supra,* 457 U.S. 202, relied on by the university, is distinguishable. That decision invalidated a Texas statute that authorized local school districts to exclude undocumented aliens from public elementary and secondary schools. The court found undocumented aliens are not, under federal equal protection analysis, a suspect class, nor is education a fundamental right. (457 U.S. at p. 223 [72 L.Ed.2d at p. 803].) It concluded, however, that Texas had failed to show that denial of free public education to young children furthered any substantial state interest. (*Id.*, at p. 230 [72 L.Ed.2d at pp. 807-808].) The heart of the opinion is found in the following passage: "[The statute] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy

will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." (*Id.*, at p. 223 [72 L.Ed.2d at p. 803].) There is, of course, a significant difference between an elementary education and a university education.

In reaching our decision, we interpret California's statutes and Constitution. We are not empowered to pass on the wisdom of legislation. Accordingly, we do not evaluate the contention of amici curiae that charging undocumented aliens nonresident tuition is shortsighted and cruel. Nor do we adjudge Bradford's response that a university education is also beyond the financial means of many hardworking, deserving citizens.

The alternative writ is discharged, and the petition for writ of mandate or prohibition is denied.

Gates, Acting P. J., and Fukuto J., concurred.

Petitioners' application for review by the Supreme Court was denied March 28, 1991. Mosk, J., and Broussard, J., were of the opinion that the application should be granted.

983

APPENDIX

Opinion No. 84-101—June 1, 1984

**SUBJECT:** EDUCATION CODE SECTION 68062(h) AND UNDOCU-
MENTED ALIENS—Educ. C § 68062(h) does not permit undocumented
aliens to establish residence for tuition purposes in California's public
institutions of higher education.

**Requested by:**   CHANCELLOR, CALIFORNIA STATE UNIVERSITY

**Opinion by:**   JOHN K. VAN DE KAMP, Attorney General

Clayton P. Roche, Deputy

The Honorable Ann Reynolds, Chancellor of the California State University, has
requested an opinion on the following question:

Does section 68062, subdivision (h) of the Education Code permit undocument-
ed aliens to establish residence for tuition purposes in California's public institutions of
higher education?

## CONCLUSION

The legislative history of Education Code section 68062, subdivision (h),
demonstrates that the Legislature did not intend to, and the subdivision does not,
permit undocumented aliens to establish residence for tuition purposes in California's
public institutions of higher education.

## ANALYSIS

Section 68000 *et seq.* of the Education Code[1] set forth "uniform student residency
requirements." The Legislature enacted these provisions with the intent that
California's "public institutions of higher education shall apply uniform rules, as set

---

[1] All section references are to the Education Code unless otherwise indicated.

984

forth. . . [therein] in determining whether a student shall be classified as a resident or nonresident." (§ 68000.)[2] The significance of these rules is that a student who is classified as a "nonresident" must pay nonresident tuition in addition to other required fees. (§ 68050.) To be classified as a "resident," a student must have been a resident "in the state for more than one year immediately preceding the residency determination date" established for the institution. (§§ 68017, 68023.) The rules set forth for the determination of residence are generally those set forth in sections 243–245 of the Government Code for the determination of legal residence or domicile. (See §§ 68060–68062.) Some exceptions to residency requirements are also set forth. (See §§ 68070–68082.)

The question presented herein is whether section 68062, subdivision (h), permits undocumented aliens to establish residence for tuition purposes so they may avoid the payment of the nonresident tuition. That subdivision provides:

> "(h) An alien, including an unmarried minor alien, may establish his or her residence, unless precluded by the Immigration and Nationality Act (8 U.S.C. § 1101, et seq.) from establishing domicile in the United States."[3]

For our purposes herein we understand the term "undocumented alien" to mean an alien who cannot prove that he or she is in the United States legally. (See, e.g., Plyler v. Doe (1981) 457 U.S. 202, 206, fn. 2.) Accordingly, "undocumented alien" usually refers to illegal aliens.

Subdivisions (h) and (i) were added to section 68062 by chapter 680, Statutes of 1983. That chapter also repealed section 68076, which had been the provision of law for determining the ability of alien students to establish residency status for tuition purposes. Section 68076 provided:

> "A student who is an adult alien shall be entitled to resident classification *if he has been lawfully admitted to the United States for permanent residence in accordance with all applicable laws of the United States;* provided, that he has had residence in the state for more than one year after such admission prior to the residence determination date for the semester, quarter or term for which he proposes to attend an institution."
> (Emphasis added.)

It is thus seen that prior to January 1, 1984, the effective date of section 68062, subdivision (h), an adult alien[4] could establish residence only if he or she was "lawfully admitted to the United States" and such lawful admission was "for permanent residence" in accordance with all laws of the United States, viz, the Immigration and Nationality Act, 8 U.S.C.A. § 1101, et seq. Consequently, under prior law, there was clearly no provision for an undocumented alien or an illegal alien to establish residence

---

[2]These rules are applicable to the University of California only to the extent adopted by the Regents. (§ 68134.)

[3]Subdivision (i) then states:
"The residence of an unmarried minor shall be derived from his or her parents pursuant to the provisions of subdivisions (f) and (g)."

[4]The statute appears to have been silent with respect to unmarried minor aliens.

for tuition purposes. The wording of the prior law had its roots in the Immigration and Nationality Act. As succinctly set forth in a relatively recent law review note:

> "Under the Immigration and Nationality Act, 8 U.S.C. §§ 1101–1503 (1976), an 'alien' is defined as 'any person not a citizen or national of the United States.' *Id.* § 1101(a)(3). Two classes of aliens exist under the Act: immigrant or resident aliens, and nonimmigrant aliens. Immigrant aliens are those admitted to permanent residence. *Id.* § 1151(a). Nonimmigrant aliens are generally admitted only for temporary periods and include students, tourists, diplomats, and temporary workers. *Id.* § 1101(a)(15). Aliens may also be admitted under the parole power of the Attorney General. *Id.* § 1182(d)(5)." (Note: Equal Treatment of Aliens, 31 Stan. L. Rev. 1069, fn. 2.)

Consequently, the thrust of section 68076 was that immigrant aliens could establish residence but nonimmigrant aliens, *although lawfully admitted,* could not. The latter category of aliens were here for temporary or presumptively not permanent residence. And, as already noted, undocumented aliens clearly were excluded under the statutory language.

With this background we now undertake the task of construing the 1983 legislation. Two basic approaches have been suggested. In support of the conclusion that undocumented or illegal aliens may establish residence under subdivision (h) of section 68062, it is urged that the subdivision is clear on its face. It is pointed out that the law no longer provides that an alien must have been "lawfully admitted"; that it merely uses the unmodified noun "alien" in conjunction with the proviso that the alien must not be "precluded by the Immigration and Nationality Act. . . from establishing domicile in the United States." It is further pointed out that nothing in the Immigration and Nationality Act expressly precludes an illegal alien from establishing a domicile. (See Cabral v. State Bd. of Control (1980) 112 Cal. App. 3d 1012, 1016–1017, fn. 5.) Finally, it is pointed out that under the case law, aliens, both legal (if not in nonimmigrant categories specifically requiring an intent to retain a foreign domicile) and illegal or undocumented, may establish a domicile of choice. (See Toll v. Moreno (1982) 458 U.S. 1, nonimmigrant alien holding G-4 VISA may establish domicile in United States; Plyler v. Doe, *supra,* 457 U.S. 202, 227, fn. 22, "illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State"; Cabral v. State Bd. of Control, *supra,* 112 Cal. App. 3d 1012, illegal aliens could establish residence (domicile) for purposes of Victims of Violent Crimes Act; Rzeszotarski v. Rzeszotarski (D.C.App. 1972) 296 A.2d 431, 435, husband's "lack of status" under immigration laws irrelevant to issue of domicile for purposes of obtaining divorce; Seren v. Douglas (Colo.App. 1971) 489 P.2d 601, student could establish intent to be domiciliary of state for tuition purposes as soon as student visa expired.)

In support of the conclusion that subdivision (h) of section 68062 does not permit an illegal or undocumented alien to establish residence for tuition purposes, it is urged that the sole reason for the repeal of section 68076 and the enactment of subdivision (h) of section 68062, was to conform California law to the recent decision of the United States Supreme Court in Toll v. Moreno, *supra,* 458 U.S. 1.

That case held that nonimmigrant aliens (i.e., those not admitted for permanent residence) holding a G-4 visa (officers or employees of certain international organizations and their families) were not precluded by the Immigration and Nationality Act from establishing a domicile in the United States. Accordingly, the Supreme Court held that under the Supremacy Clause (U.S. Const., art. VI, cl. 2), the State of Maryland, which predicated in-state status for tuition purposes at the University of Maryland on domicile, could not bar "G-4[5] aliens (and their dependents) from acquiring in-state status." (*Id.*, at p. 17.)

In reaching its decision with respect to the ability of G-4 visa holders and their dependents to establish domicile in the United States, the Court relied upon its prior decision in the same litigation to that effect, Elkins v. Moreno (1978) 435 U.S. 647. In that case the Court noted that, with respect to some nonimmigrant categories, Congress had specifically provided that such aliens were admitted on the condition that they did not intend to abandon their foreign residence, e.g., visitors to the United States, students, aliens in "immediate and continuous transit," vessel crewman "who intends to land temporarily," and temporary workers having a residence in a foreign country; that, accordingly, such nonimmigrants could not establish a domicile in the United States, absent an adjustment of status. From such specific provisions, the court implied an ability of other nonimmigrant aliens, such as G-4 VISA holders, to be capable of becoming domiciliaries of Maryland. (*Id.*, at pp. 665–668.) Thus in Toll v. Moreno, *supra*, the Court stated:

> "The Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.* (1976 ed. and Supp. IV), represents 'a comprehensive and complete code covering all aspect of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents.' Elkins v. Moreno, 435 U.S., at 664. *The Act recognizes two basic classes of aliens, immigrant and nonimmigrant.* [19]With respect to the nonimmigrant class, the Act establishes various categories, the G-4 category among them. For many of these nonimmigrant categories, Congress has precluded the covered alien from establishing domicile in the United States. *Id.*, at 665. [20]But significantly, Congress has allowed G-4 aliens — employees of various international organizations, and their immediate families — to enter the country on terms permitting the establishment of domicile in the United States. *Id.*, at 666. In light of Congress' explicit decision not to bar G-4 aliens from acquiring domicile, the State's decision to deny 'in-state' status to G-4 aliens, solely on account of the G-4 alien's federal immigration status, surely amounts to an ancillary 'burden not contemplated by Congress' in admitting these aliens to the United States. . . ." (*Id.*, at pp. 13–14, emphasis added. Fns. omitted.)

The argument in support of the second position, that is, that section 68062, subdivision (h), does *not* permit undocumented aliens to establish residence for tuition

---

[5]G-4 visas are issued to nomimmigrant aliens who are officers or employees of certain international organizations and to members of their immediate families. (8 U.S.C. § 1101(a)(15)(G)(iv).)

purposes, points out the underscored language above as being the source of the language contained in subdivision (h) that an alien may establish residence "unless precluded by the Immigration and Nationality Act (8 U.S.C. § 1101 *et seq.*) from establishing domicile in the United States." The argument then urges that such fact fortifies the basic contention that subdivision (h) was enacted merely to conform California law with the Supreme Court's decision in Toll v. Moreno. Accepting this as true, the argument proceeds to point out that the terminology of both Toll v. Moreno and subdivision (h) refers to the establishment of domicile *in the United States,* not domicile in the state. Accordingly, as we understand the argument, subdivision (h) requires a determination of domicile under federal law, viz, the Immigration and Nationality Act. The argument urges that that act contemplates the establishment of "lawful domicile" when domicile is a relevant consideration under the act. (See, e.g., Lok v. I.N.S. (2d Cir. 1982) 681 F.2d 107, 109–110.) Therefore, the argument concludes, an undocumented or illegal alien is precluded under the federal act from establishing a domicile *in the United States.*[6]

Without any further evidence of legislative intent, both arguments for and against construing section 68062, subdivision (h), as permitting undocumented aliens to qualify as residents for tuition purposes in California colleges and universities are fairly evenly balanced. The literal wording of the statute arguably permits the construction that they may qualify. However, taking into consideration (1) the prior laws in California, and (2) the timing of the 1983 amendments with the decision in Toll v. Moreno, *supra,* 458 U.S. 1, such arguably evinces an intent on the part of the Legislature to deal only with the problem of nonimmigrant, and hence legal, aliens such as G-4 visa holders and their dependents.

In construing a statute, the primary consideration is to attempt to ascertain the intent of the Legislature in order to effectuate the purpose of the law. Although normally a statute which is clear and unambiguous is to be construed according to its plain meaning, this is not the case if to do so will lead to absurd results or will be contrary to the manifest intent of the Legislature. Accordingly, we need not concern ourselves herein with whether section 68062, subdivision (h), is or is not ambiguous. We may construe the enactment in accordance with the discernible intent of the Legislature even if the statute is unambiguous.[7] In so doing, we can consider the

---

[6]An alternate conclusion to be drawn from the wording of subdivision (h) which occurs to us is that the Immigration and Nationality Act, as construed by the Supreme Court, insofar as it either precludes or permits the establishment of a domicile, does so *only with respect to nonimmigrant, or legal, documented aliens.* Accordingly, the language of section 68062, subdivision (h), was intended to refer solely to documented aliens. In short, the federal act does not purport to deal with the question of the establishment of a domicile on the part of undocumented aliens. See Cabral v. State Bd. of Control, *supra,* 112 Cal. App. 3d 1012, 1017, at fn. 5. This approach is more consistent with the argument that the 1983 legislation was merely intended to conform California law with Toll v. Moreno.

[7]As stated by our Supreme Court in County of Sacramento v. Hickman (1967) 66 Cal. 2d 841, 849, fn. 6:

"'6/ We disagree, however, with respondent's sweeping assertion that in all cases 'ambiguity is a condition precedent to interpretation.' Although this proposition is generally true, 'The literal meaning of the words of a statute may be disregarded to avoid absurd .results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.' (Silver v. Brown (1966) 63 Cal. 2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689], and cases cited.)"

988

historical circumstance of the statute and its legislative history, including legislative committees' analyses of the legislation as it went through the enactment process.[8]

We have reviewed available records concerning Assembly Bill 2015 for the 1983 legislative session, which became chapter 680, Statutes of 1983. These include the Staff Analysis of the Senate Committee on Education (7/13/83); the Ways and Means Committee Summary prepared for the June 9, 1983, hearing; the Legislative Analyst's analyses, dated June 6 and August 19, 1983; the Staff Analysis of the Assembly Education Committee; the analysis of the Senate Democratic Caucus, dated 8/23/83; and the Enrolled Bill Report, dated 9/2/83.

A review of all these documents demonstrates unequivocally that the purpose of the bill was to bring California law in conformity with federal law, specifically the United States Supreme Court decision in Toll v. Moreno, *supra*, 458 U.S. 1, as to residence requirements for attendance at public colleges and universities, and also the Court's decision in Nyquist v. Mauclet (1977) 432 U.S. 1 as to student aid.[9] The documents are replete with statements to that effect. Thus, with respect to the "historical circumstances" of the enactment of chapter 680, Statutes of 1983, this confirms what has been urged in the arguments presented to us as to Toll v. Moreno.

More importantly, the foregoing documents and analyses demonstrate an intent on the part of the Legislature to *exclude* from the scope of section 68062 *illegal* aliens. Thus, the Staff Analysis of the Assembly Education Committee stated, inter alia:

"DIGEST: This bill provides that the determination of residency for *legally admitted* alien students be the same for purposes of:

"attendance of [sic] a public postsecondary institution. . . ." (Emphasis added.)

And, similarly the Ways and Means Committee Summary stated inter alia:

"*This bill* provides that the determination of residency for *legally admitted* alien students and out of state students be the same for purposes of:

"a. attendance at a public postsecondary instutition. . . ." (Second emphasis added.)

---

[8]With respect to the foregoing general and specific rules of construction, see, e.g., Sand v. Superior Court (1983) 34 Cal. 3d 567, 570–571; People v. Black (1982) 32 Cal. 3d 1, 5; California Teachers Assn. v. San Diego Community College Dist (1981) 28 Cal. 3d 692, Southern Cal. Gas Co. v. Public Utilities Com. (1979) 24 Cal. 3d 653, 658–659 (statements in legislative committee analyses); Southland Mechanical Constructors Corp. v. Nixen (1981) 119 Cal. App 3d 417, 427–428 (statements in legislative committee analysis).

[9]Nyquist v. Mauclet, *supra*, 432 U S. 1, held a New York law to be unconstitutional as a denial of equal protection which required "resident aliens" to have applied for citizenship in order to qualify for state financial assistance for higher education. The aliens involved in the suit were legally within the United States. Accordingly, the suit did not involve nor rule upon undocumented or illegal aliens.

Chapter 680, Statutes of 1983 also amended section 69535 with respect to eligibility for student aid, requiring that "[a]ll Cal Grant recipients shall be residents of California, as determined. . . pursuant to the provisions of Part 41 (commencing with Section 68000)." Accordingly, as to aliens, the student aid provision now incorporates by reference section 68062.

989

And finally, the Legislative Analyst's Digests of the bill (AB 2015) stated inter alia both on June 6, 1983 and August 19, 1983:[10]

> "This bill deletes the requirements that aliens be U.S. citizens or legally admitted as permanent residents in order to be classified as a California resident for purposes of tuition or financial aid. The bill places aliens under the same residency requirements as other out-of-state students, except for alien students who are specifically precluded from establishing U.S. residency under federal immigration law. Alien students who would not be eligible for California residency under this bill include illegal aliens and students on temporary student visas." (Emphasis added.)

Accordingly, the legislative history of section 68062, subdivision (h), demonstrates that it was intended only to implement federal law as declared by the United States Supreme Court in Toll v. Moreno, *supra*, 458 U.S. 1, and was not intended to encompass undocumented or illegal aliens. Thus, insofar as the arguments pro and con with reference to the question considered herein may have been said to have been evenly balanced before an examination of the legislative history of Assembly Bill 2015, 1983 Legislative Session, this history clearly tips the scales in favor of the conclusion that section 68062, subdivision (h), does not permit undocumented or illegal aliens to acquire residency for tuition purposes.[11]

We so conclude.

---

[10]The bill was enacted on August 29, 1983 and sent to enrollment on such date.

[11]It is possible that this interpretation of the statute raises constitutional issues of equal protection. (See Plyler v. Doe, *supra*, 457 U.S. 202.) We have not been asked and have not considered such questions.