Filed 12/9/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| EARL DE VRIES, | B264487 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC555614) |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge.  Affirmed.

Judicial Watch, Inc., Sterling E. Norris and Chris Fedeli (admitted *pro hac vice*) for Plaintiff and Appellant.

Office of the General Counsel University of California, Charles F. Robinson, Karen J. Petrulakis and Margaret L. Wu; Munger, Tolles & Olson, Bradley S. Phillips (Los Angeles) and Benjamin J. Horwich (San Francisco) for Defendant and Respondent.

———————

# INTRODUCTION

Federal law makes undocumented immigrants ineligible for state and local public benefits, but allows a state to "affirmatively provide[] for such eligibility" through "the enactment of a State law." (8 U.S.C. § 1621(d).) The California Constitution generally gives the Regents of the University of California plenary authority to establish rules and policies to govern the internal affairs of the University of California. The issue in this appeal is whether three California legislative "enactments" affirmatively provide "eligibility" under federal law for postsecondary education benefits to qualified undocumented immigrants who attend the University of California, even though the statutes require only the California State University and California community colleges to provide such benefits. We conclude that, even though the California Constitution may preclude the Legislature from actually conferring postsecondary education benefits on undocumented immigrants attending the University of California, the Legislature has made these students "eligible" for such benefits within the meaning of the federal statute. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1996 Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which, among many other things, made undocumented immigrants[1] ineligible

---

[1] The Personal Responsibility and Work Opportunity Reconciliation Act refers to undocumented immigrants as

for certain state and local public benefits, including benefits related to postsecondary education.  (8 U.S.C. § 1621 (section 1621).)  The same law, however, gives states authority to make undocumented immigrants "eligible for any State or local public benefit for which such [undocumented immigrant] would otherwise be ineligible under [section 1621] only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."  (*Id.*, § 1621(d) (section 1621(d)).)

The California Legislature subsequently enacted three laws addressing postsecondary education benefits for certain qualified undocumented immigrants.  These laws include (1) Assembly Bill No. 540 (2001-2002 Reg. Sess.) (A.B. 540), which makes qualified undocumented immigrants eligible for exemption from

---

"alien[s]" who are not qualified for public benefits under various federal laws.  (See 8 U.S.C. § 1621(a).)  We use the term "undocumented immigrant" to refer to "a non-United States citizen who is in the United States but who lacks the immigration status required by federal law to be lawfully present in this country and who has not been admitted on a temporary basis as a nonimmigrant" (*In re Garcia* (2014) 58 Cal.4th 440, 446, fn. 1), which encompasses the category of persons referred to as unqualified "aliens" in title 8 United States Code section 1621.  Assembly Bill No. 540 (A.B. 540), one of the California statutes at issue in this case, used both "undocumented immigrant" and "nonimmigrant alien" to refer to the same class of people.  (See Stats. 2001, ch. 814, §§ 1, subd. (a)(4), 2, subd. (a).)  The current version of Education Code section 68130.5, which A.B. 540 added, refers to the same class of people as "nonimmigrant foreign national[s] within the meaning of paragraph (15) of subsection (a) of Section 1101 of Title 8 of the United States Code." (Educ. Code, § 68130.5, subd. (a).)

nonresident tuition (Stats. 2001, ch. 814, §§ 1-2); (2) Assembly Bill No. 131 (2011-2012 Reg. Sess.) (A.B. 131), which makes qualified undocumented immigrants eligible for student financial aid programs (Stats. 2011, ch. 604, § 3); and (3) Senate Bill No. 1210 (2013-2014 Reg. Sess.) (S.B. 1210), which makes qualified undocumented immigrants eligible for student loan benefits (Stats. 2014, ch. 754, § 3).

The California Constitution limits the Legislature's power to regulate the University of California (UC) and the Regents of the University of California (the Regents),[2] which administers the University of California. (Cal. Const., art. IX, § 9, subd. (a).) Those limits traditionally extend to matters "involving internal university affairs," with a few exceptions. (*San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785, 789 (*Labor Council*); *People v. Lofchie* (2014) 229 Cal.App.4th 240, 250.)[3] Because of its constitutional autonomy, the Regents (rather than the Legislature) adopted three policies to provide the benefits identified in A.B. 540, A.B. 131, and S.B. 1210 to qualified undocumented immigrant students attending the University of California. (Regents of U.C., Policy 3106.1.C; Policy 3202.2; Policy 3202.3.)

---

[2] We refer to "the Regents" in the singular because the California Constitution created a "corporation known as 'The Regents of the University of California,'" a singular noun. (Cal. Const., art. IX, § 9, subd. (a).) Some decisions, statutes, and legislative materials we quote in this opinion refer to "the Regents" as a plural noun.

[3] Neither party contends that any of these exceptions apply here.

Earl De Vries, a California taxpayer, filed this action against the Regents, alleging that none of its policies qualifies under section 1621(d) as a "State law" making undocumented immigrants eligible for postsecondary education benefits. De Vries further alleged that the Legislature has not enacted any statute that "affirmatively provid[es]" eligibility for the benefits the University of California now gives to undocumented immigrants, as required by section 1621(d). Indeed, De Vries alleged that the Legislature could never confer such eligibility because the Constitution prohibits the Legislature from regulating the University of California. De Vries sought to enjoin the Regents "from expending or causing the expenditure of taxpayer funds and taxpayer-financed resources to exempt unlawfully present aliens from paying nonresident supplemental tuition and to allow unlawfully present aliens to apply for and participate in state-administered financial aid programs."

The Regents demurred. It argued that the California Supreme Court's decision in *Martinez v. Regents of the University of California* (2010) 50 Cal.4th 1277 (*Martinez*), which held the exemption in A.B. 540 from nonresident tuition complies with the "affirmatively provides" requirement of section 1621(d), forecloses De Vries's current challenge, and that the analysis in *Martinez* applies equally to the financial aid program in A.B. 131 and the student loan program in S.B. 1210. Alternatively, the Regents argued that the laws enacting A.B. 540, A.B. 131, and S.B. 1210 nevertheless satisfy the requirements of section 1621(d) with respect to UC students and, even if they did not, the policies of the Regents satisfy section 1621(d) because they have the force and effect of "state law." In opposition to the demurrer, De Vries argued that the Supreme Court in *Martinez* did not address the

University of California's "unique, constitutionally independent status," nor did the Supreme Court determine "whether the Regents's resolution purportedly making AB 540 applicable to [the University] satisfies Section 1621" because the parties in that case stipulated that A.B. 540 applied to the University of California.

The trial court sustained the demurrer with leave to amend, concluding that the Regents's policies satisfy section 1621(d).  The court cited California and United States Supreme Court authorities stating that "'policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes.'"  (Emphasis deleted.) (See, e.g., *Hamilton v. Regents of the University of California* (1934) 293 U.S. 245, 258; *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 164-165; *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135.)  Thus, the trial court ruled that the Regents's policies "adopting the exemption codified in AB540, the eligibility for state-administered financial aid programs codified in AB131 and eligibility for the student loan program codified in SB1210 would qualify as a 'State law . . . which affirmatively provides for such eligibility' of State or local benefit for purposes of 8 U.S.C. § 1621(d)."

After De Vries failed to file an amended complaint, the trial court dismissed the action with prejudice and entered judgment for the Regents.  De Vries timely appealed.

# DISCUSSION

De Vries makes two principal arguments. First, he argues that the Legislature has not passed any statutes affirmatively providing eligibility for benefits to UC students who are undocumented immigrants. Second, he contends the trial court erred by concluding that the Regents's policies constitute "state laws" that comply with section 1621(d).

"On review from an order sustaining a demurrer, 'we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose.'" (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; accord, *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) We also review de novo questions of statutory construction. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232; *Davis v. Fresno Unified School District* (2015) 237 Cal.App.4th 261, 275.) "'We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.'" (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433; accord, *Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1411.)

A.      *Statutory and Constitutional Framework*

1.      *Title 28 United States Code Section 1621*

Congress enacted section 1621 as part of the Personal Responsibility and Work Opportunity Reconciliation Act. (Pub.L. No. 104-193 (Aug. 22, 1996) 110 Stat. 2105.)  The Act has over 900 sections, including section 1621, which appears in a chapter entitled "Restricting Welfare and Public Benefits for Aliens."

Section 1621(a) provides:  "Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not— [¶] (1) a qualified alien (as defined in section 1641 of this title),[4] [¶] (2) a nonimmigrant under the Immigration and Nationality Act [8 U.S.C. § 1101 et seq.], or [¶] (3) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. § 1182(d)(5)] for less

---

4      Title 8 United States Code section 1641 defines the term "qualified alien" as "(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. § 1101 et seq.], [¶] (2) an alien who is granted asylum under section 208 of such Act [8 U.S.C. § 1158], [¶] (3) a refugee who is admitted to the United States under section 207 of such Act [8 U.S.C. § 1157], [¶] (4) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year, [¶] (5) an alien whose deportation is being withheld under section 243(h) of such Act [8 U.S.C. § 1253] . . . or section 241(b)(3) of such Act [8 U.S.C. § 1251(b)(3)] . . . , [¶] (6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act [8 U.S.C. § 1153(a)(7)] as in effect prior to April 1, 1980; or [¶] (7) an alien who is a Cuban [or] Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)."  (Fn. omitted.)

than one year, [¶] is not eligible for any State or local public benefit (as defined in subsection (c) of this section)." This case concerns undocumented immigrants who do not fall within any of the exempt categories of "aliens" listed in section 1621(a).

Section 1621(c) defines "State or local public benefit" to include, among other things, "any . . . postsecondary education . . . benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." The parties do not dispute that the resident tuition exemption in A.B. 540, the financial aid programs in A.B. 131, and the student loan programs in S.B. 1210 are "State or local public benefits" within the meaning of section 1621(c).

Section 1621(d) states: "A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section *only through the enactment of a State law* after August 22, 1996, *which affirmatively provides for such eligibility*." (Italics added.) As noted, De Vries contends that neither A.B. 540, nor A.B. 131, nor S.B. 1210 "affirmatively provides for such eligibility" for UC students, and that policies the Regents adopted to implement A.B. 540, A.B. 131, and S.B. 1210 are not "enactments of State law" within the meaning of section 1621(d).

### 2. *The University's Status Under the California Constitution*

The University of California is a public trust established pursuant to article IX, section 9, of the California Constitution as

follows:  "(a) The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services."  Article IX, section 9(f), further provides, in part:  "The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs."

"The California Supreme Court has recognized that '[a]rticle IX, section 9, grants the regents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the regents.'  [Citation.]  This constitutional grant of power to the Regents includes both quasi-judicial and quasi-legislative powers, according [the Regents] 'virtual autonomy in self-governance.'  [Citation.]  '"The Regents have the general rule-making or policy-making power in regard to the University . . . and are . . . fully empowered with respect to the organization and government of the University."'"  (*People v. Lofchie, supra*, 229 Cal.App.4th at pp. 248-249, fn. omitted, quoting *Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529, 540, and *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135.)

10

As a result, "[t]he Regents may . . . exercise quasi-legislative powers, subject to legislative regulation. Indeed, '[p]olicies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes.'" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320, quoting *Regents of University of California v. City of Santa Monica*, *supra*, 77 Cal.App.3d at p. 135; see, e.g., *Hamilton v. Regents of the University of California* (1934) 293 U.S. 245, 258 [a Regents order making military instruction compulsory "is a statute of the state within the meaning of [a statute establishing federal jurisdiction]"]; *Campbell v. Regents of University of California*, at p. 321 [a Regents policy for handling whistleblower claims under its power to govern and organize the University is treated as a statute in order to determine whether the exhaustion doctrine applies]; see also *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 207; *Kim v. Regents of University of California*, *supra*, 80 Cal.App.4th at p. 165.)

In some circumstances, state legislation concerning matters outside those specifically enumerated in the Constitution may apply to the University of California. The Supreme Court has deemed some such laws "matters of statewide concern" and has considered whether the law in question "would infringe upon sovereign governmental powers." (*Regents of University of California v. Superior Court* (1976) 17 Cal.3d 533, 536; see *Labor Council*, *supra*, 26 Cal.3d at p. 789 ["legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs"]; *Regents of University of California v. Superior Court*,

11

at p. 536.) Neither side argues that A.B. 540, A.B. 131, or S.B. 1210 addresses "matters of statewide concern."

  3.  *State Enactments Making Undocumented Immigrants Eligible for Postsecondary Education Benefits*

    a.  *A.B. 540 and nonresident tuition*

Education Code section 68040 provides,[5] "Each student shall be classified as a resident or nonresident at the University of California, the California State University, or the California Maritime Academy or at a California community college." Section 68050 provides, "A student classified as a nonresident shall be required, except as otherwise provided in this part, to pay, in addition to other fees required by the institution, nonresident tuition." "Thus, nonresidents must generally pay nonresident tuition at public universities and colleges in California." (*Martinez*, *supra*, 50 Cal.4th at p. 1286.)

In 2001 the Legislature enacted A.B. 540. Section 1 of A.B. 540 states in relevant part: "The people of the State of California do enact as follows: [¶] (a) The Legislature hereby finds and declares all of the following: [¶] (1) There are high school pupils who have attended elementary and secondary schools in this state for most of their lives and who are likely to remain, but are precluded from obtaining an affordable college education because they are required to pay nonresident tuition rates." (Stats. 2001, ch. 814, § 1, subd. (a)(1).) Section 1, subdivision (a)(4), states:

---

[5]  Statutory references are to the Education Code unless otherwise indicated.

12

"This act . . . allows all persons, including undocumented immigrant students who meet the requirements set forth in Section 68130.5 of the Education Code, to be exempt from nonresident tuition in California's colleges and universities." (Stats. 2001, ch. 814, § 1, subd. (a)(4).)

Section 2 of A.B. 540 added section 68130.5 to Part 41, article 11 of the Education Code. Section 68130.5, as amended, provides:

"(a) A student, other than a nonimmigrant foreign national within the meaning of paragraph (15) of subsection (a) of section 1101 of Title 8 of the United States Code, who meets all of the following requirements shall be exempt from paying nonresident tuition at the California State University and the California Community Colleges:

"(1) Satisfaction of either of the following:

"(A) High school attendance in California for three or more years.

"(B) Attainment of credits earned in California from a California high school equivalent to three or more years of full-time high school coursework and a total of three or more years of attendance in California elementary schools, California secondary schools, or a combination of those schools.

"(2) Graduation from a California high school or attainment of the equivalent thereof.

"(3) Registration as an entering student at, or current enrollment at, an accredited institution of higher education in California not earlier than the fall semester or quarter of the 2001-02 academic year.

"(4) In the case of a person without lawful immigration status, the filing of an affidavit with the institution

of higher education stating that the student has filed an application to legalize his or her immigration status, or will file an application as soon as he or she is eligible to do so.

"(b) A student exempt from nonresident tuition under this section may be reported by a community college district as a full-time equivalent student for apportionment purposes.

"(c) The Board of Governors of the California Community Colleges and the Trustees of the California State University shall prescribe rules and regulations for the implementation of this section.

"(d) Student information obtained in the implementation of this section is confidential."

Section 68134 is part of Part 41, Chapter 1, article 11 of the Education Code. Section 68134, which predates the enactment of A.B. 540, provides: "No provision of this part shall be applicable to the University of California unless the Regents of the University of California, by resolution, make such provision applicable."

b. *A.B. 131 and financial aid programs*

In 2011 the Legislature enacted A.B. 131. (Stats. 2011, ch. 604.) The bill separately addressed financial aid programs administered by the University of California (commonly referred to as "UC Grants") and those administered by the State of California (commonly referred to as "Cal Grants"). Section 1 of A.B. 131 added section 66021.6 regarding eligibility for UC Grants. It provides in relevant part: "Notwithstanding any other law, and except as provided for in subdivision (b), the Trustees of the California State University and the Board of Governors of the California Community Colleges shall, and the

14

Regents of the University of California are requested to, establish procedures and forms that enable persons who are exempt from paying nonresident tuition under Section 68130.5, or who meet equivalent requirements adopted by the regents, to apply for, and participate in, all student aid programs administered by these [schools] to the full extent permitted by federal law.  The Legislature finds and declares that this section is a state law within the meaning of Section 1621(d) of Title 8 of the United States Code."

Section 3 of A.B. 131 added section 69508.5 regarding eligibility for Cal Grants.  It provides in relevant part: "Notwithstanding any other law, and except as provided for in subdivision (c), a student who meets the requirements of subdivision (a) of Section 68130.5, or who meets equivalent requirements adopted by the Regents of the University of California, is eligible to apply for, and participate in, any student financial aid program administered by the State of California to the full extent permitted by federal law.  The Legislature finds and declares that this section is a state law within the meaning of [section 1621(d)] of Title 8 of the United States Code."

c.      *S.B. 1210 and student loan programs*

Most recently, in 2014, the Legislature enacted S.B. 1210 (referred to as the California DREAM Loan Act) to make undocumented immigrants eligible for certain student loan programs.  (Stats. 2014, ch. 754.)  Section 2 of S.B. 1210 states: "Since 2002, students have been exempt from paying nonresident tuition and fees at the California Community Colleges, the California State University, and the University of California pursuant to Section 68130.5.  Commencing in 2011, these

15

students were eligible for state financial aid or financial aid offered by these public institutions.  Nevertheless, many of these students remain ineligible for federal student aid for reasons beyond their control.  Lack of access to federal student loans presents a substantial barrier for these students to obtain a baccalaureate degree from the California State University or the University of California."  (Stats. 2014, ch. 754, § 2, subd. (b).) "The California DREAM Loan Act addresses this barrier by providing access to additional state aid so students may take full advantage of the educational opportunities offered at the California State University and the University of California." (§ 2, subd. (c).)

Section 3 of S.B. 1210 added several provisions to the Education Code, including sections 70032 and 70033. Section 70032, subdivision (i), defines "Participating institution" to include "any campus of the . . . University of California that elects to participate in the DREAM Program pursuant to the requirements specified for a qualifying institution."  Section 70033, subdivisions (a) and (a)(1), provide, "Commencing with the 2015-16 academic year, a student attending a participating institution may receive a loan under the DREAM Program if the student satisfies all of the following requirements," including that the "student is exempt from paying nonresident tuition under Section 68130.5, or meets equivalent requirements adopted by the Regents of the University of California."

16

4. *The Regents's Policies Making Undocumented Immigrants Eligible for Postsecondary Education Benefits*

The Regents adopts standing orders and policies for the University of California. (Regents of U.C., Policy 1000.) Following the Legislature's enactments of A.B. 540, A.B. 131, and S.B. 1210, the Regents adopted corresponding policies for UC students. Regents Policy 3106.1.C addresses nonresident tuition and provides: "The University of California shall exempt students from tuition and/or fees or waive tuition and/or fees, as set forth below. . . . [¶] [¶] . . . as provided in [Education Code] Section 68130.5 (AB 540)." (Regents of U.C., Policy 3106.1.C.)

Regents Policy Nos. 3202.2 and 3202.3 address financial aid and student loan programs for students who qualify under A.B. 540 for nonresident tuition. Policy 3202.2 provides in part: "The University of California shall extend financial aid to any student exempt from paying nonresident tuition under California Education Code Section 68130.5 and Regents Policy 3106." (Regents of U.C., Policy 3202.2.) Policy Nos. 3202.2 and 3202.3 identify the statutory programs through which eligible students may receive financial aid and student loans, including the programs established under section 66021.6 and the California DREAM Loan Program. (Regents of U.C., Policy Nos. 3202.2, 3202.3.)

B. *Enactments and Eligibility Under Section 1621(d)*

As noted, section 1621(d) allows a state to make undocumented immigrants eligible for postsecondary education benefits "through the enactment of a State law . . . which affirmatively provides for such eligibility." De Vries argues that

17

A.B. 540, A.B. 131, and S.B. 1210 do not provide eligibility for UC students because those measures apply only to students of California State University and California community colleges. ~(AOB 15)~ In so doing, De Vries suggests that the requirement of section 1621(d) that state laws provide "eligibility" for state or local public benefits means that such laws must actually confer benefits on qualified undocumented immigrants.  De Vries further argues that, because the University of California's constitutional status precludes the Legislature from making UC students eligible for benefits under section 1621(d), no legislative enactment can ever comply with section 1621(d) with respect to UC students.

The Regents contends that *Martinez* controls this case because the Supreme Court's opinion in *Martinez* "directly addressed and upheld the nonresident tuition exemption that [De Vries] challenges here."  The Regents further contends that, because the legislative enactments making undocumented immigrants eligible for the financial aid and student loan programs De Vries challenges are "materially indistinguishable from the nonresident tuition exemption," *Martinez* dictates that those "parallel authorizations" also satisfy section 1621(d).  In the alternative, the Regents argues that its policies are "state law" within the meaning of section 1621(d) and that, at a minimum, the acts of the Legislature in combination with Regents policies satisfy federal law.

### 1. *Martinez Is Not Controlling*

Preliminarily, we agree with De Vries that *Martinez* is not controlling.  In *Martinez* the Supreme Court considered a challenge to A.B. 540 under section 1621 and another provision of

18

the Personal Responsibility and Work Opportunity Reconciliation Act that prohibits undocumented immigrants from receiving postsecondary education benefits on the basis of their residence. (*Martinez, supra*, 50 Cal.4th at pp. 1284, 1294; see 8 U.S.C. § 1623).) With respect to section 1621, the plaintiffs alleged the defendants, including the Regents, the Board of Trustees of the California State University, the California Community Colleges, and officials representing those entities, unlawfully exempted undocumented immigrant students from nonresident tuition because A.B. 540 did not "affirmatively provide" eligibility for that benefit. (*Martinez*, at p. 1294.) The parties stipulated that "the Regents have, by resolution, made [A.B. 540] applicable" to undocumented immigrants. (*Martinez*, at p. 1287, fn. 1.)

The Supreme Court held that A.B. 540 satisfies the requirement of section 1621(d) that a state law "affirmatively provide" eligibility for undocumented immigrants to receive State or local public benefits.[6] (*Martinez, supra*, 50 Cal.4th at p. 1295.) The court, however, did not define or interpret the term "eligibility." Moreover, unlike De Vries, the plaintiffs in *Martinez* did not argue that the Legislature could not make UC students eligible for public benefits because of the University of

_____

[6] The Supreme Court in *Martinez* also held that a state statute does not comply with section 1621(d) unless it "'expressly state[s] that it applies to undocumented aliens, rather than conferring a benefit generally without specifying that its beneficiaries may include undocumented aliens.'" (*Martinez, supra*, 50 Cal.4th at p. 1296; see *Garcia, supra*, 58 Cal.4th at p. 458.) De Vries does not argue that either A.B. 131 or S.B. 1210 fails to comply with this standard; indeed, he appears to concede that each statute does comply.

California's constitutional status.  The Supreme Court in *Martinez* did not address that specific question in connection with A.B. 540, and it did not decide that or any other issue in connection with A.B. 131 or S.B. 1210.  *Martinez*, therefore, does not control the outcome of this case.

2.    *A.B. 540, A.B. 131, and S.B. 1210 Are "Enactments of State Law"*

The Personal Responsibility and Work Opportunity Reconciliation Act does not define the phrase "enactment of a State law" in section 1621(d).  De Vries argues that these words require "an enactment of the state legislature," while the Regents argues that the phrase is broader and includes measures such as the quasi-legislative acts of the Regents.  We need not decide whether the Regents's broader view is correct because, even under De Vries's narrower standard, A.B. 540, A.B. 131, and S.B. 1210 are "enactments of State law."

The Legislature enacted A.B. 540, A.B. 131, and S.B. 1210, and the Governor signed all three measures into law. (Stats. 2001, ch. 814 [approved by the Governor Oct. 12, 2001]; Stats. 2011, ch. 604 [approved by the Governor Oct. 8, 2011]; Stats. 2014, ch. 754 [approved by the Governor Sept. 27, 2014].) Even under De Vries's theory, they qualify as enactments under section 1621(d), and De Vries does not contend otherwise. Indeed, each of the three measures contains the prefatory language, "The people of the State of California do enact as follows," confirming that it is an "enactment of a State law."  (See *Branch v. Smith* (2003) 538 U.S. 254, 264 ["[a]n 'enactment' is the product of legislation, not adjudication," citing the definition of "enact" in Webster's New Internat. Dict. (2d ed. 1949) p. 841 as

20

"'[t]o make into an act or law; esp., to perform the legislative act with reference to (a bill) which gives it the validity of law'"]; see also *Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 86 [an uncodified section of an act "is fully part of the law" and "must be read together with provisions of codes"].)

3.  *The Meaning of "Eligibility" Under Section 1621(d)*

The Personal Responsibility and Work Opportunity Reconciliation Act also does not define or interpret the word "eligibility" in section 1621(d). "When a term goes undefined in a statute, we give the term its ordinary meaning." (*Taniguchi v. Kan Pacific Saipan, Ltd.* (2012) ___U.S.___, ___ [132 S.Ct. 1997, 2002] (*Taniguchi*); see *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.* (2009) 555 U.S. 271, 276 ["[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning"]; *Hardt v. Reliance Standard Life Ins. Co.* (2010) 560 U.S. 242, 251 [we assume that "'the ordinary meaning of [a statute's] language accurately expresses the legislative purpose'"]; see also *People v. Barros* (2012) 209 Cal.App.4th 1581, 1593 [using "[t]he plain meaning of the word 'proceeding'" where the phrase was "not defined in the statute"]; *Arnall v. Superior Court* (2010) 190 Cal.App.4th 360, 369 ["we look first to the term's 'plain meaning' for guidance" when the statute does not define the term]; *In re Eureka Reporter* (2008) 165 Cal.App.4th 891, 897 [turning to the "plain and commonsense meaning" of a term not defined in the statute].)

In divining a term's "ordinary meaning," courts regularly turn to general and legal dictionaries. (See, e.g., *Freeman v. Quicken Loans, Inc.* (2012) ___U.S.___, ___, 132 S.Ct. 2034, 2041-

21

2042; *Taniguchi, supra*, \_\_U.S. at p. \_\_, 132 S.Ct. at p. 2002; *Lopez v. Gonzales* (2006) 549 U.S. 47, 53-54; *MCI Telecommunications Corp. v. American Tel. & Tel. Co.* (1994) 512 U.S. 218, 225 (*MCI Telecommunications*); see also *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 244 ["[w]e use the ordinary dictionary meaning of terms when terms are not defined in the statute"]; *County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1592 ["'[a] dictionary is a proper source to determine the usual and ordinary meaning of a word or phrase in a statute'"]; *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* (2001) 93 Cal.App.4th 531, 539 ["'courts . . . turn to general dictionaries when they seek to ascertain the "ordinary" meaning of words used in a statute'"].) Merriam-Webster's Collegiate Dictionary defines "eligible" (the adjective form of the noun "eligibility") as "qualified to participate or be chosen." (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 404; see American Heritage Dict. (2d ed. 1985) p. 446 ["eligible" means "[q]ualified, as for an office or position"]; 5 Oxford English Dict. (2d ed. 1989) p. 140 ["eligibility" means "[f]itness to be chosen or preferred"].) Black's Law Dictionary similarly defines "eligible" as "[f]it and proper to be selected or to receive a benefit; legally qualified for an office, privilege, or status." (Black's Law Dict. (10th ed. 2014) p. 634, col. 1; see also Ballentine's Law Dictionary (3d ed. 1969) p. 396 ["eligibility" means "[f]itness for selection"].) Thus, the ordinary meaning of "eligibility" connotes qualification for a benefit, not entitlement to that benefit.[7]

_____

[7]    Webster's New International Dictionary and its abridged version published as Webster's New Collegiate Dictionary include

22

Another provision of the Personal Responsibility and Work Opportunity Reconciliation Act enacted at the same time as section 1621 confirms this interpretation of the word "eligibility" as used in section 1621(d).  (See *Taniguchi, supra,* ___U.S. at p. ___ [132 S.Ct. at pp. 2004-2005] [considered together, other provisions of the same act provide "strong contextual clue[s]" of a term's ordinary meaning]; *Dyna-Med, Inc. v. Fair Employment &*

---

"entitled" among several meanings of "eligible," including "qualified to be chosen" and "permitted under football rules to catch a forward pass."  (Webster's Third New International Dictionary (2002) p. 736; Webster's Ninth New Collegiate Dict. (1984) p. 404; see *MCI Telecommunications, supra,* 512 U.S. at p. 226, fn. 2 ["Webster's New Collegiate Dictionaries . . . are essentially abridgments of that company's Webster's New International Dictionaries"].)  "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense."  (*Taniguchi, supra,* U.S. at p. ___ [132 S.Ct. at p. 2003]; see *Mallard v. United States Dist. Court for Southern Dist. of Iowa* (1989) 490 U.S. 296, 301 [relying on the "most common meaning" and the "ordinary and natural signification" of the word "request," even though it may sometimes "double for 'demand' or 'command'"].)  No other common or legal dictionary we consulted defines "eligible" as "entitled."  (See *Taniguchi, supra,* ___ U.S. at p. ___ [132 S.Ct. at p. 2004] ["[b]ased on our survey of the relevant dictionaries, we conclude that the ordinary or common meaning of 'interpreter' does not include those who translate writings [as suggested by Webster's Third]"].)  Thus, we reject the definition of "eligible" in Webster's Third New International and New Collegiate Dictionaries as including "entitled."  (See *ibid.*; *MCI Telecommunications,* at p. 227 [rejecting the suggested meaning of a word in one dictionary and its progeny where that definition "contradicts one of the meanings contained in virtually all other dictionaries," italics omitted].)

*Housing Com.* (1987) 43 Cal.3d 1379, 1387 ["[t]he words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible"]; *Sutter Health v. Superior Court* (2014) 227 Cal.App.4th 1546, 1555 [looking to "the context and ordinary meaning" of a term "not defined in the statute"].) Section 1621 is contained in United States Code title 8, chapter 14, which consists of four subchapters. One subchapter includes a provision entitled "Statutory construction," which states: "Nothing in this chapter may be construed as an *entitlement* or a determination of an individual's *eligibility* or fulfillment of the requisite requirements for any Federal, State, or local governmental program, assistance, or benefits. For purposes of this chapter, eligibility relates only to the general issue of eligibility or ineligibility on the basis of alienage." (8 U.S.C. § 1643(a)(1), italics added.)

The juxtaposition of "entitlement" and "eligibility" makes clear that these words are not synonymous as they are used in title 8 United States Code section 1643(a)(1). Indeed, that provision indicates that "eligibility" is broader than "entitlement" and describes a person who may qualify to receive a benefit but has no legal right to it. (See *Immigration and Naturalization Service v. Cardoza-Fonseca* (1987) 480 U.S. 421, 444 ["those who can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum"]; *Jarecha v. Immigration and Naturalization Service* (5th Cir. 1969) 417 F.2d 220, 223 [as 8 U.S.C. § 1255 "is now construed, an applicant who meets the objective prerequisites is merely eligible for adjustment of status, he is in no way entitled

24

to such relief"].)  Because """identical words used in different parts of the same act are intended to have the same meaning,"""" we construe "eligibility" in section 1621(d) to mean "qualified to receive a benefit" as that term is used in title 8 United States Code section 1643(a)(1).  (See *Taniguchi, supra,* ___ U.S. at p. ___ [132 S.Ct. at pp. 2004-2005] ["interpreter" as used in 28 U.S.C. § 1920 has the same meaning as used in 28 U.S.C. § 1827]; accord, *Gustafson v. Alloyd Co.* (1995) 513 U.S. 561, 570; *Department of Revenue of Ore. v. ACF Industries, Inc.* (1994) 510 U.S. 332, 342; see also *Gustafson v. Alloyd Co.*, at p. 568 ["[a] term should be construed, if possible, to give it a consistent meaning throughout [an] Act"].)

De Vries suggests that section 1621(d) requires state laws to actually confer benefits on qualified undocumented immigrants. ~(AOB 15, 18; ARB 1)~ That is not what section 1621(d) says.  Section 1621(d) requires only that state laws make undocumented immigrants "eligible" for public benefits.

C.    *A.B. 540, A.B. 131, and S.B. 1210 Provide Eligibility for UC Students To Receive Postsecondary Education Benefits*

In construing a statute, """our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' . . . We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' . . . If, however, the statutory language is ambiguous, 'we may resort to extrinsic sources, including the

25

ostensible objects to be achieved and the legislative history.""'" (*Lee v. Hanley*, *supra*, 61 Cal.4th at pp. 1232-1233; accord, *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors*, *supra*, 48 Cal.4th at p. 45; *Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)  Extrinsic sources include "'the statutory scheme, the apparent purposes underlying the statute and the presence (or absence) of instructive legislative history.'" (*County of San Diego v. Alcoholic Beverage Control Appeals Bd.* (2010) 184 Cal.App.4th 396, 401; see *Mt. Hawley Insurance Company v. Lopez* (2013) 215 Cal.App.4th 1385, 1400 (*Mt. Hawley*).) "'"Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute.'"' (*Lee v. Hanley*, at p. 1233; accord, *Mays v. City of Los Angeles*, at p. 321.)

1.    *A.B. 540*

a.    *The language of A.B. 540 is unambiguous*
A statute's language is ambiguous when it is subject to more than one reasonable interpretation.  (See *Bruns v. E– Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1162-1163; *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)  Here, the language of A.B. 540 broadly applies to make "all persons" attending any "accredited institution of higher education in California" eligible for an exemption from nonresident tuition,"including undocumented immigrant students who meet the requirements set forth in Section 68130.5." (See *Martinez*, 50 Cal.4th

26

at p. 1295.) "All persons" means all persons, including UC students. Nothing in A.B. 540, including the requirements set forth in section 68130.5, can be reasonably interpreted to limit or restrict UC students from eligibility for the exemption from nonresident tuition. The language is unambiguous.

De Vries contends that A.B. 540 does not make UC students eligible for the exemption from nonresident tuition because it does not "apply to" the University of California. In support of his argument, De Vries cites section 68134, which states: "No provision of this part shall be applicable to the University of California unless the Regents of the University of California, by resolution, make such provision applicable." De Vries notes that the Supreme Court in *Martinez* cited section 68134 in observing that, "[b]y its terms, [A.B. 540] applies only to the California State University and California Community Colleges, and not to the University of California." (*Martinez*, *supra*, 50 Cal.4th at p. 1287, fn. 1.)

Section 68134, however, does not negate UC students' eligibility for the exemption from nonresident tuition under A.B. 540, nor does it render the language of A.B. 540 ambiguous. As the Regents argued in its demurrer, A.B. 540 makes all qualified students *eligible* for the exemption from nonresident tuition. Pursuant to section 68134, UC students are not *entitled* to that benefit unless the University of California elects to provide it. Indeed, section 68134 and the Supreme Court's reference to that statute in *Martinez* address whether A.B. 540 "applies to" the University of California, not whether it "applies to" UC students or makes them "eligible" for certain benefits. Whether A.B. 540 "applies to" the University of California is not relevant to whether A.B. 540 makes UC students eligible for the

27

exemption from nonresident tuition.  As noted, section 1621(d) requires only that state law provide eligibility for undocumented immigrants to receive public benefits.  It does not require that state law confer such benefits on eligible persons or mandate that any other entity do so.

De Vries also argues that, because section 68130.5, subdivision (a), which provides that qualified undocumented immigrants "shall be exempt from paying nonresident tuition at the California State University and the California Community Colleges," makes no mention of the University of California, A.B. 540 must exclude UC students from eligibility for the exemption from nonresident tuition.  The absence of language in section 68130.5 referring to the University of California, however, does not eliminate UC students from eligibility for that benefit.  Section 68130.5, subdivision (a), merely requires California State University and California community colleges to exempt their qualifying students from paying nonresident tuition.  (See § 68130.5, subd. (c) ["[t]he Board of Governors of the California Community Colleges and the Trustees of the California State University *shall* prescribe rules and regulations for the implementation of this section," italics added].)  It may be, as De Vries argues, that A.B. 540 (and A.B. 131 and S.B. 1210) "cannot require the Regents to provide eligibility" for UC students.  But section 1621(d) does not place that burden on the Legislature.  It only requires that the Legislature provide "eligibility" for public benefits, which the Legislature has done through A.B. 540.

*In re Garcia*, *supra*, 58 Cal.4th 440 presented an analogous, though not identical, scenario.  That case involved a state statute making undocumented immigrants eligible for membership in

28

the State Bar.  Although the California Constitution gives the
Supreme Court "ultimate authority" for establishing policies
relating to admission to the Bar,[8] the Legislature enacted
Business and Professions Code section 6064, subdivision (b),
which provides that "the Supreme Court *may admit* [an]
applicant [who is not lawfully present in the United States] as an
attorney at law in all the courts of this state and *may direct* an
order to be entered upon its records to that effect." (*Garcia*, at
p. 451, fn. 9, italics added.)  *Garcia* held that Business and
Professions Code section 6064 satisfied the requirements of
section 1621(d) because the former section "explicitly authoriz[es]
a bar applicant 'who is not lawfully present in the United States'
to obtain a law license." (*Garcia*, at p. 458.)

Business and Professions Code section 6064, however,
merely made undocumented immigrants eligible for admission to
the Bar.  The Supreme Court retained authority to confer or deny
membership "as a matter of state law" or for reasons specific to
the applicant.  (*Garcia*, *supra*, 58 Cal.4th at p. 459.)  Thus,
Business and Professions Code section 6064 "remov[ed] any
federal statutory barrier" to admitting undocumented

---

[8]     *Garcia* explained:  "Although both the Legislature and this
court possess the authority to establish rules regulating
admission to the State Bar, under the California Constitution
this court bears the ultimate responsibility and authority for
determining the issue of admission." (*Garcia*, 58 Cal.4th at
p. 451; see *id*. at p. 452, fn. 11.)  Thus, the Legislature arguably
exercises more authority over policies affecting admission to the
State Bar than it does over policies affecting tuition rates at the
University.

immigrants to the State Bar, and the Supreme Court ultimately conferred that benefit on qualified applicants. (*Ibid.*)

Similarly, A.B. 540 removed the federal barrier to making undocumented immigrants eligible for the exemption from nonresident tuition, and the Regents conferred that benefit on qualified UC students. Nothing in section 1621(d), California's Constitution, or A.B. 540 requires more. In short, legislative deference to the University's constitutional status does not affect the Legislature's express intent to make UC students eligible for the exemption from nonresident tuition. De Vries's suggestion that A.B. 540 does not provide "eligibility" for UC students within the meaning of that term under section 1621(d) is not reasonable and does not cast doubt on the clarity of A.B. 540. (See *Coalition of Concerned Communities, Inc. v. City of Los Angeles*, *supra*, 34 Cal.4th at p. 737 [language is unambiguous unless it is subject to more than one "reasonable interpretation"].)

> b. *The legislative history of A.B. 540 confirms that UC students are eligible for the exemption from nonresident tuition*

Although it is not necessary to look to legislative history and other extrinsic sources because A.B. 540 is unambiguous, the legislative history and subsequent legislative enactments confirm our interpretation. (See *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1335 [although the meaning of language in a statute "is plain, it is helpful to look at [the statute's] legislative history"]; *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046 ["we [may] look to legislative history to confirm our plain-meaning construction of statutory language"]; *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 613, fn. 7 ["courts may always test

their construction of disputed statutory language against extrinsic aids bearing on the drafters' intent"]; *United Health Centers of San Joaquin Valley, Inc. v. Superior Court* (2014) 229 Cal.App.4th 63, 79 ["'[r]eviewing courts may turn to the legislative history behind even unambiguous statutes when it confirms or bolsters their interpretation'"].) "We look to the Legislative Counsel's digest and other summaries and reports indicating the Legislature's intent." (*Mt. Hawley, supra*, 215 Cal.App.4th at p. 1401; see *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors*, *supra*, 48 Cal.4th at p. 56, fn. 15 ["'[w]e have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent'"]; *Valley Vista Services, Inc. v. City of Monterey Park* (2004) 118 Cal.App.4th 881, 889 ["[w]hen construing a statute, we may consider its legislative history, including committee and bill reports, and other legislative records"].)

Several enrolled bill reports for A.B. 540 refer repeatedly to tuition and "eligibility" rates for UC students in assessing the impact of A.B. 540 on the state and its student population. For example, the Enrolled Bill Report of the Office of the Secretary of Education notes that the estimated percentage of the student population "who may qualify for a nonresident tuition exemption under provisions of [the] bill . . . is less than 1% of the total student population at the three public higher education institutions, the UC, the CSU [California State University], and the CCC [California community colleges]." (Off. of the Sect. for Educ., Rep. on Assem. Bill. No. 540 (2001-2002 Reg. Sess.) Oct. 3, 2001, p. 5.) The Enrolled Bill Report goes on to state, "The UC and the CSU estimate minor, absorbable costs based on the

31

low number of students who would qualify for a nonresident tuition exemption under the provisions of this bill." (*Id*. at p. 6; see also Dept. of Finance, Rep. on Assem. Bill No. 540 (2001-2002 Reg. Sess.) Oct. 10, 2001, pp. 2-3; Dept. of Finance, Rep. on Assem. Bill No. 540 (2001-2002 Reg. Sess.) July 3, 2001, pp. 1-3; Assem. Republican Bill Analysis, Higher Educ. Com., Rep. on Assem. Bill No. 540 (2001-2002 Reg. Sess.) Sept. 13, 2001, p. 2.) If A.B. 540 did not provide eligibility for UC students to benefit from the nonresident tuition exemption, there would be no need for the Legislature to consider the impact of A.B. 540 on the University of California and its students.

De Vries argues that a sentence in the Legislative Counsel's Digest of A.B. 540 supports his contention that A.B. 540 provides eligibility only to students of California State University and California community colleges. He points to language stating, "These provisions are applicable to the University of California only if the Regents of the University of California act to make them applicable." (Legis. Counsel's Dig., Assem. Bill No. 540 (2001-2002 Reg. Sess.) 2001 Stats. ch. 814, p. 93.) As discussed with respect to the almost identical language in section 68134, however, the fact that A.B. 540 does not "apply to" the University of California does not affect UC students' "eligibility" for the nonresident tuition exemption.

Moreover, the sentence De Vries cites from the Legislative Counsel's Digest refers not to A.B. 540, but to language in section 68062, described by the Legislative Counsel's Digest as "existing law," which provided that an "alien" may establish "residence" in California unless precluded by federal law. (§ 68062, subd. (h).) In *Regents of University of California v. Superior Court* (1990) 225 Cal.App.3d 972 (*Regents v. Superior Court*) the court held

32

that federal law prohibited California colleges and universities (including the University of California) from classifying undocumented immigrants as "residents" under section 68062. (*Id.* at p. 980.)  The court in that case acknowledged that section 68134 made section 68062 applicable to the University of California "only to the extent its Regents adopt it" (*Regents v. Superior Court*, *supra*, at p. 976, fn.1), meaning that the Regents could, but was not required to, classify qualified "aliens" as "residents" under section 68062.  A.B. 540 now allows California colleges and universities to make undocumented immigrants eligible for the exemption from nonresident tuition based on factors other than their "residence," thus complying with federal law.  (*Martinez*, *supra*, 50 Cal.4th at p. 1290; see 8 U.S.C. § 1623 [prohibiting "an alien who is not lawfully present in the United States" from eligibility for postsecondary education benefits "on the basis of residence"].)  As was the case with section 68062, section 68134 allows the Regents to adopt the nonresident tuition exemption provided by A.B. 540 if it chooses to do so.

We assume the Legislature knew of section 68134 and its effect on other provisions of the Education Code when the Legislature enacted section 2 of A.B. 540, which added section 68130.5.  (See *People v. Scott* (2014) 58 Cal.4th 1415, 1424 ["the Legislature "'is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof'""].)  We also assume the Legislature intended section 68134 to have the same effect on section 68130.5 that it had on section 68062.  (See *People v. Scott*, at p. 1424 ["[c]ourts may assume . . . that the Legislature intended to maintain a consistent body of rules and to adopt the meaning of statutory terms already construed"].)  That effect is to

acknowledge the University of California's special status under the California Constitution and to allow the University to decide whether to confer on its students the benefits for which they are eligible under state law.[9]

Finally, S.B. 1210, which the Legislature enacted in 2014, acknowledges that A.B. 540 applies to UC students even if it does not apply to the University. S.B. 1210 states, "Since 2002, students have been exempt from paying nonresident tuition and fees at the California Community Colleges, the California State University, and the University of California pursuant to Section 68130.5."[10] (Stats. 2014, ch. 754, § 2, subd. (b).) While not binding, "'a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration.'" (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th

---

[9] Other Education Code statutes follow a similar pattern. For example, section 68075.5, subdivision (a), exempts certain members of the Armed Forces stationed in California from paying nonresident tuition at the California State University and California community colleges. Even though that provision does not reference the University of California, another subdivision of section 68075.5, subdivision (c), asks the University of California to adopt policies regarding tuition rates for eligible veterans that conform to the requirements of section 68075.5, subdivision (a). Thus, through section 68075.5, subdivision (c), the Legislature intended to make veterans attending a UC school eligible for the benefit of in-state tuition.

[10] The same provision also acknowledges that A.B. 131 makes UC students "eligible for state financial aid or financial aid offered by [that] public institution." (Stats. 2014, ch. 754, § 2, subd. (b).)

34

914, 922; see *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 724 ["'[w]hile "subsequent legislation interpreting [a] statute . . . [cannot] change the meaning [of the earlier enactment,] it [does supply] an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted"'"].) Here, S.B. 1210 confirms that A.B. 540 makes UC students eligible for the nonresident tuition exemption.

### 2. *A.B. 131 and S.B. 1210*

A.B. 131 and S.B. 1210, like A.B. 540, make undocumented immigrants attending the University of California eligible for financial aid and student loan programs and rely on the Regents to confer these benefits on qualified students. The language of A.B. 131 and S.B. 1210, like the language of A.B. 540, does not exclude from eligibility any qualified students on the basis of the institution they attend. Indeed, by specifically referencing the University of California and its students, those measures provide eligibility for the specified benefits to those students, regardless of whether the University ultimately confers such benefits on them.

For example, section 3 of A.B. 131, which added section 69508.5, addresses eligibility for Cal Grants and states that "a student who meets the requirements of subdivision (a) of Section 68130.5, or who meets equivalent requirements adopted by the Regents of the University of California, is eligible to apply for, and participate in, any student financial aid program administered by the State of California to the full extent permitted by federal law." The plain language of this provision makes clear that UC students are eligible to participate in the

35

Cal Grant program.[11] Section 1 of A.B. 131, which added section 66021.6, applies to UC Grants and states that "the Regents of the University of California are requested to . . . establish procedures and forms that enable persons who are exempt from paying nonresident tuition under Section 68130.5, or who meet equivalent requirements adopted by the [R]egents, to apply for, and participate in, all student aid programs administered by these [schools] to the full extent permitted by federal law." Thus, section 1 of A.B. 131 makes undocumented UC students eligible to participate in the UC Grant program.

De Vries argues that the reference in A.B. 131 to "requirements adopted by the Regents of the University of California" means that "its terms do not apply to UC students." Putting aside the fact that the Regents is not involved in the Cal Grants program, De Vries's argument lacks merit. Section 1621(d) does not require an enactment of state law to specify the terms under which eligible beneficiaries may receive certain benefits. Section 1621(d) merely requires the enactment of state law to make undocumented immigrants eligible for those benefits, and A.B. 131 satisfies that requirement, regardless of whether, as De Vries argues, UC students' eligibility for UC Grants requires them to meet certain conditions adopted by the Regents.

In terms even plainer than A.B. 540 and A.B. 131, S.B. 1210 provides eligibility to qualified UC students to benefit from certain student loan programs. Section 3 of S.B. 1210, which added section 70033, subdivision (a)(1), states: "Commencing

---

[11] The Regents notes that it plays no role in conferring Cal Grants on any students, including UC students.

36

with the 2015-16 academic year, a student attending a *participating institution* may receive a loan under the DREAM Program if the student satisfies all of the following requirements: [¶] (1) The student is exempt from paying nonresident tuition under Section 68130.5, or meets equivalent requirements adopted by the Regents of the University of California." (Italics added.) A "participating institution" is defined as "any campus of the . . . University of California that elects to participate in the DREAM Program pursuant to the requirements specified for a qualifying institution . . . ." (§ 70032, subd. (i).) Thus, UC students are eligible to participate in the DREAM Program established by S.B. 1210.

## DISPOSITION

The judgment is affirmed. The Regents is to recover its costs on appeal.


SEGAL, J.

We concur:

PERLUSS, P. J.                    KEENY, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.